602 A.2d 407

The SCHOOL DISTRICT OF the CITY OF ERIE
and City of Erie and County of Erie

v.

HAMOT MEDICAL CENTER OF the CITY OF ERIE
and Erie County Board of Assessment Appeals.

Appeal of HAMOT MEDICAL CENTER
OF the CITY OF ERIE.

Commonwealth Court of Pennsylvania.

Argued Feb. 13, 1991.

Decided Jan. 9, 1992.

Reargument Denied March 17, 1992.

James D. McDonald, Jr. and Daniel M. Mulholland, III, for appellant.

Gerald J. Villella, for appellee City of Erie.

John W. Beatty, for appellee School District of City of Erie.

Seymour J. Schafer, for amicus curiae Hosp. Council of Western Pennsylvania.

Brad A. Memeilly and Roland Morris, for amicus curiae Hosp. Ass'n of Pennsylvania.

Ann Leopold, for amicus curiae Voluntary Hospitals of America, Inc.

Before CRAIG, President Judge, and DOYLE, McGINLEY, SMITH and KELLEY, JJ.

DOYLE, Judge.

This is an appeal by Hamot Medical Center of the City of Erie (Hamot) from an order of the Court of Common Pleas of Erie County which declared that Hamot was not entitled to retain its tax-exempt status for real property taxes. The common pleas court order reversed the decision of the Erie County Board of Assessment and Appeals (Assessment Board).

The case began in August 1988 when the City of Erie (City) demanded that Hamot make a payment of $100,000 in lieu of taxes or face a challenge to its property tax exemption. Hamot refused to comply with the City's demands and the City filed an appeal of the tax-exempt status with the Assessment Board. Thereafter, the School District of the City of Erie (School District) filed a similar appeal.

Although Hamot immediately filed suit to enjoin the Assessment Board hearings from going forward, the common pleas court affirmed the jurisdiction of the Assessment Board and dismissed Hamot's equity suit. Thereafter, a hearing was held before the Assessment Board and based upon the evidence presented at that hearing the Board ruled that Hamot was entitled to retain its tax-exempt status for the properties in question. The School District then filed a "complaint and appeal" with the Court of Common Pleas of Erie County and the City was permitted to intervene in that action. Hamot filed preliminary objections challenging the jurisdictional basis for the complaint and appeal as well as the standing of the City and School District to challenge Hamot's tax-exempt status. These preliminary objections were overruled. Further, the court ruled that a de novo hearing would be held. In a subsequent order, the trial court declared that Hamot had to bear the burden of proof

with respect to its tax-exempt status and after a lengthy hearing, the court issued a decision reversing the Assessment Board's ruling of Hamot's tax-exempt status. After post-trial exceptions and a motion to determine the need for post-trial exceptions were disposed of, Hamot appealed to this Court. On appeal we are asked to decide first whether the trial court acted improperly in conducting a de novo review of the case and assigning the burden of proof to Hamot and, second, whether on the merits, the trial court applied the appropriate law in deciding that Hamot was not entitled to retain its tax-exempt status.

■ We begin by recognizing that the appeal in this case was taken to the trial court under the provisions of Section 754 of the Local Agency Law, 2 Pa.C.S. § 754. That provision provides as follows:

§ 754. **Disposition of appeal**

(a) **Incomplete record.**—In the event a full and complete record of the proceedings before the local agency was not made, the court may hear the appeal de novo, or may remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court.

(b) **Complete record.**—In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

It is clear from the language in Section 754 that the trial court is empowered to hear the case de novo only if it determines that the record before the local agency was incomplete.

A review of the record reveals that at the Assessment Board level the City sought to obtain certain documents from Hamot in what could loosely be described as an attempt at pretrial discovery. Hamot, however, refused to turn over the relevant documents. Indeed, it does not dispute its refusal. Further, the Assessment Board took the position that it was not empowered to compel the production of documents. Information sought by the City and not provided by Hamot included the compensation paid to Hamot's top level executives, the audited financial statements of Hamot, and an explanation of a profit-incentive bonus program which applied to Hamot executives. While we recognize that the absence of this information before the Assessment Board was not the reason articulated by the trial court for allowing a de novo appeal, the fact remains that the refusal to supply this documentation was of record and in determining whether the trial court abused its discretion deeming a de novo review necessary, we believe it is proper to look at the entire record made before the local agency. Further, we may affirm a trial court's ruling on a basis different from that employed below provided the basis on which we affirm is clear on the record. *Rhoads v. Lancaster Parking Authority*, 103 Pa.Commonwealth Ct. 303, 520 A.2d 122 (1987). We conclude, based on the record, that the trial court committed no error in hearing the case de novo. Because we believe the reasons we articulate constitute a valid basis for a determination that the record before the Assessment Board was incomplete, we need not decide whether the reason given by the trial judge (that such review had been in essence "promised" by a different trial judge in a proceeding ancillary to this one) was a legally proper one. We now move to the secondary question of whether it properly placed the burden of proof on

Hamot when Hamot had prevailed before the Assessment Board.

■ There is a dearth of case law on this issue. *Lawrence Township Appeal*, 117 Pa.Commonwealth Ct. 508, 544 A.2d 1070 (1988), is, however, instructive. In that case, a police officer after receiving a hearing before the township board of supervisors was suspended for two weeks and then demoted. Thereafter, the officer appealed to the common pleas court seeking a hearing de novo. The court granted the request for a de novo hearing. Prior to the hearing, however, counsel for both parties entered into a stipulation concerning how the evidence would be presented. One of the conditions of the stipulation was never met resulting in the stipulation never becoming effective. The township failed to present any evidence whatsoever at the trial court level. The trial court, therefore, ordered the officer to be reinstated. The question this Court was then asked to decide on appeal was who properly bore the burden of proof before the trial court. We observed that when the lower court hears an appeal from a governmental agency de novo, the burden is upon the governmental body "to prove all of the elements, both procedural and substantive necessary to support its adjudication." We thus concluded that the township had the burden of going forward with the evidence. The burden was properly placed on the township because it was the township's duty to show initially that the suspension and demotion were merited. We elicit from *Lawrence Township* that where the parties begin the litigation all over again the burden of proof should be identical to that before the local agency.

In the instant case, however, we hold that the burden of proof was always with Hamot. *See Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 13 n. 7, 487 A.2d 1306, 1312 n. 7 (1985) (holding that where there is a review of a charitable exemption in light of a change in circumstances, the entity seeking to retain its tax-exempt status bears the burden of proof). Accordingly, we conclude that

the trial court committed no error in assigning the burden of proof to Hamot.

Because of our disposition of these procedural issues, we must now consider the substantive question of whether the trial court applied the appropriate law in determining that Hamot was not entitled to retain its tax-exempt status. The central question presented is which of two cases, *Hospital Utilization Project,* or *West Allegheny Hospital v. Board of Property Assessment,* 500 Pa. 236, 455 A.2d 1170 (1982), controls the outcome on the particular facts before us. And, in tax exemption cases, the facts are of critical importance because it has been held by our Supreme Court that prior decisions based on then-current information and facts have limited value as precedent. *G.D.L. Plaza Corp. v. Council Rock School District,* 515 Pa. 54, 526 A.2d 1173 (1987). The *G.D.L.* Court observed that the value of precedent is limited because of the continually changing nature of the concept of charity and the many variable circumstances of time, place and purpose.

The trial court in its forty-six page opinion made thorough findings which we shall attempt to summarize. Hamot was founded in 1881 by public and private charities and operated as a non-profit corporation whose purpose was to deliver health care to the Erie community. In 1981, Hamot went through an extensive corporate reorganization [1] resulting in the creation of Hamot Health Systems, Inc. (HHSI). HHSI's purpose was to oversee the activities of various organizations, one of which is Hamot. Among the other organizations which HHSI oversees are Hamot Corporate Services, Inc. (providing management and administrative services for HHSI and its affiliated organizations), Regional Health Services, Inc. (providing ambulatory and related

---

1. Hamot argues that because its tax-exempt status was not challenged until several years after the reorganization, the taxing bodies waived their right to do so. This argument we believe is without merit. There is nothing to show that the taxing bodies "knew" Hamot's situation had changed and voluntarily agreed to forgo any rights they had to challenge its continuing tax-exempt status. None of the elements of equitable estoppel are present in this case.

health care services), Senior Living Services, Inc. (providing senior citizen care and services), the Center For Personal and Family Growth (offering psychological and support services), Bayside Pharmacy Services, Inc. (operating a pharmacy), Independent Professional Services, Inc. (owner of a medical diagnostic service and magnetic resonance imaging facility), Joint Patient Services, Inc. (offering oncology and cancer treatment), Community Rehabilitation Specialists (providing rehabilitative health services), Great Lakes Home Health (providing health care services and selling durable medical equipment), Cardiac Fitness (engaged in health care for patients with health disorders), College Park Properties (owner of certain real estate in Edinboro, Pennsylvania), and Great Lakes Manage Care (holding a license to operate a health maintenance facility). The trial court also found that HHSI oversees the Bayfront Regional Development Corporation which owns a condominium unit and several other corporations which in turn own real estate in the Erie area. One of these corporations, Bayside Development Corporation, purchased a marina for approximately $375,000 and spent $120,000 on its renovation. It continues to operate that marina. The court further found that Hamot employees and affiliates had the opportunity to secure boat slips at the marina before the public was notified. The court also determined that as part of the financing package of the Springhill Retirement Home the health care assets of Hamot are covered by

a liquidity agreement dated December 1, 1989. Per this agreement $5,000,000.00 of Hamot's health care assets would be at risk if that particular project went into default. Hamot has contracted to purchase up to five million dollars worth of HHSI's assets if called upon to do so. HHSI would then, in turn, transfer the needed funds to Springhill. This pledge places [Hamot] assets in jeopardy. Theoretically, if Springhill went under, Hamot Medical Center could be driven to bankruptcy. The reason being that if the assets had any market value, [Ha-

mot] would not be required to purchase them. [Hamot] would be purchasing worthless assets.

Trial court opinion p. 7.

The trial court further found that Hamot operated an answering service and paging system company which competes with local answering service companies and also operates a health club which competes with local health spas and nautilus clubs. Further, HHSI controls, through Bayfront Development Corporation, space which is rented to non-affiliated private businesses. The trial court additionally found that since the corporate reorganization in 1981 the Center has operated at a total overall profit of nearly fifty-eight million dollars. Hamot contends that this excess revenue is not profit because it is put back into the operations for capital expansions. The trial court, however, observed that the place where the funds are utilized is irrelevant to its characterization as profit.

The trial court also found that executive compensation at Hamot is "copious" with some executives receiving salary plus retirement benefit packages of $250,000 to $300,000. Certain executives are also the beneficiaries of other perks such as payment by Hamot of membership dues to, *inter alia*, the Erie Yacht Club.

Further, the trial court found that Hamot spent in excess of one million dollars in advertising in the 1987 fiscal year, over $800,000 in the 1988 fiscal year and almost $700,000 for the 1989 fiscal year. Its community relations department is staffed by eleven persons and operates on an annual budget of over half a million dollars.

On the issue of HHSI's relationship to Hamot, the trial court found that HHSI controlled the appointment of Hamot's Board of Directors and approved Hamot's bylaws and its annual budget. Further, it determined that eight of the members of HHSI's Board constitute the entire Hamot Board, Hamot's budget had to be approved by the parent corporation before it could expend funds, Hamot's bill collection policy and patient bill of rights are generated by HHSI, HHSI's Board determines the yearly amount of

funds to be transferred from Hamot to HHSI and HHSI controls Hamot's right to collection of charitable donations. According to the trial court,

> [s]ince the corporate reorganization of 1981, charitable contributions have been directed to the Second Century Foundation. This has been done to maximize [Hamot's] reimbursements under the Medicare and Medicaid programs.... Any grants by Second Century in excess of $20,000.00 require HHSI's approval.... This results not only in [Hamot] not getting the actual donations, but [Hamot] also misses out on any interest that money may generate.

Trial court opinion p. 11 (citations to record omitted).

In the years between the 1981 reorganization and 1989, Hamot made transfers in excess of $25,000,000 in funds to HHSI and Hamot Corporate Services, Inc. (a total of 46% of Hamot's operating profits for the years 1981 through 1989).[2] These transfers were approved by the Erie County Orphans Court. The question of tax-exempt status, however, was not addressed in those proceedings. Testimony found credible by the trial court included the fact that $9,000,000 of the assets that were transferred to related companies since 1981 were invested in real estate including the condominium project, the marina and office buildings.

The trial court also found that Hamot was required to provide emergency health care to those who cannot afford it as a condition of its license.[3] Further, it is required to generate a bill for every patient.[4] Hamot could not state the number of patients written off *voluntarily* as charity patients. It found that Hamot's uncompensated care included patients who did not or could not pay their bills. It specifically indicated that

**2.** Contrary to Hamot's assertion, the trial court did not pierce HHSI's corporate veil in making this determination, as its focus was on transfers made *by Hamot,* not HSSI.

**3.** *See* Section 8 of the Health Care Cost Containment Act, Act of July 8, 1986, P.L. 408, 35 P.S. § 449.8.

**4.** *See* Section 5(d)(11) of the Health Care Cost Containment Act, Act of July 8, 1986, P.L. 408, 35 P.S. § 449.5(d)(11).

'uncompensated care patients,' not poor enough to qualify for Medicaid, are aggressively pursued by Hamot through every avenue of the collection process. Hamot has sued the very patients that it would now have this court deem objects of charity. These cases are numerous as evidenced by the School District's Exhibit, which indicated the number of collection actions filed in the Office of the Prothonotary of Erie County. Hamot's collection agency not only pursues collection of money but takes individual assets by execution.

Trial court opinion p. 14.

After making these findings, the trial court determined that Hamot did not qualify as a "purely public charity" within the meaning of Article VIII, Section 2(a)(v) of the Pennsylvania Constitution and further that it was not entitled to the statutory property exemption appearing in Section 204(a)(3) of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3). Section 204 pertinently provides:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . .

(3) All hospitals, universities, colleges, seminaries, academies, associations, and institutions of learning, benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose.

The ultimate determination we must make is whether Hamot is correct in its assertion that the trial court committed error in applying the five prong test set forth in *Hospital Utilization Project* instead of the factual and

legal matrix of *West Allegheny Hospital.* Before determining, however, which case controls, we must recognize the interplay between the constitutional and statutory provisions. Under Article VIII, Section 2 of the Pennsylvania Constitution, the legislature is empowered to confer tax-exempt status on "institutions of purely public charity." This constitutional provision, however, "does not, of itself, exempt any property; it merely permits the legislature to do so within certain limits." *G.D.L. Plaza,* 515 Pa. at 58, 526 A.2d at 1175 (quoting *Donohugh's Appeal,* 86 Pa. 306, 309 (1878)). But, the question of whether the entity seeking or defending a tax exemption is a purely public charity within the meaning of Article VIII is a preliminary inquiry which must be addressed *before* the question of whether that entity meets the statutory qualifications can even be reached. *G.D.L. Plaza,* 515 Pa. at 59 n. 2, 526 A.2d at 1175 n. 2. With this understanding in mind, we now proceed to an examination of the *West Allegheny* and *Hospital Utilization* cases.

In *West Allegheny,* West Allegheny Hospital applied for a tax exemption. The Board of Property Assessment, Appeals and Review denied the exemption. The common pleas court reversed, granting the exemption. The Commonwealth Court reversed. The Supreme Court then reversed the Commonwealth Court. The Supreme Court began its analysis by indicating, "[i]t is clear that appellant's facilities are 'purely public' within the meaning of [Article VIII, Section 2]." *West Allegheny,* 500 Pa. at 239, 455 A.2d at 1171. This determination was based upon the fact that since its inception West Allegheny Hospital had maintained an open admissions policy which provided comprehensive health care without regard to a patient's ability to pay. The Supreme Court determined that despite the facts that public and private donations covered only a small part of the hospital's cost of capital acquisition and day-to-day operating expenses and that the remainder of those costs had been passed along to patients who had paid approximately 80% of the amounts billed, the hospital was a purely public

charity because of its open admissions policy. After determining that West Allegheny Hospital met the threshold constitutional requirement, it then went to determine that it met the statutory requirements as well.

Subsequent to its determination in *West Allegheny Hospital,* the Supreme Court decided the *Hospital Utilization Project* case. In that case, Hospital Utilization Project (HUP) was an entity whose function was to prepare statistical abstracts of medical records including such information as admissions and discharge data, medical diagnosis, treatment, length of stay and identity of the treating physician. This information was then collated and computerized and complete reports were distributed to area hospitals so that they could compare statistics for particular diagnosis. Although for a three year period, an association known as the Hospital Council had funded HUP, when HUP became financially secure, the Hospital Council withdrew from the project and the various hospitals then undertook to fund HUP through direct payment for HUP's services. Participating hospitals were charged a set fee for patient abstracts and received certain standard reports. Entities other than hospitals could purchase HUP reports at set fees and the fees were based upon HUP's approximate cost in producing the reports. Other projects undertaken by HUP were made available for a charge based upon the actual computer time and programming hours expended.

HUP contended that as a "charitable organization" it was entitled to an exemption from the sales and use tax. *See* Section 204 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7204. In reviewing the constitutional basis for this exemption, the Supreme Court was called upon to decide what was meant by the term "institution of purely public charity," as employed in Article VIII. It held that an entity qualifies as a purely public charity if it possesses the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*Hospital Utilization Project*, 507 Pa. at 22, 487 A.2d at 1317. Applying this five prong test, the Supreme Court concluded that HUP was not entitled to a charitable exemption.

Hamot argues here that the *West Allegheny* case, because it involved a hospital, is the law which should be applied. It contends that because it had an open admissions policy it is entitled to tax-exempt status. Alternatively it asserts that if *Hospital Utilization Project* applies it meets the criteria enunciated therein.

First, we acknowledge that the Supreme Court has indicated that *Hospital Utilization Project* does not constitute a departure from prior law. *G.D.L. Plaza.* Thus, we would be hesitant to conclude that *West Allegheny* has been overruled by implication. There is no dispute, however, that the *Hospital Utilization Project* test has never been specifically applied to a hospital. But, even assuming that *West Allegheny* is the standard by which to measure the facts of this case, Hamot still cannot prevail.[5] This is because the trial court did not find that Hamot had an open admissions policy. While it is undisputed that Hamot would provide *emergency* health care to individuals who could not afford it, the trial court concluded that this was a condition of licensure. If it is compelled by law to perform this service, it cannot be said to perform it voluntarily or charitably.[6] Further, the trial court found that with respect to

---

5. Hamot, in the portion of its brief dealing with this issue, cites to an unreported case filed by this Court. Such citation is violative of 210 Pa.Code § 67.55, which prohibits citations to this Court's memorandum opinions.

6. The fact that Hamot has a non-discriminatory admissions policy does not mean it is a purely public charity, as Hamot contends. There is no indication that it provides non-emergency services to persons it knows cannot pay for them. It was *Hamot's* burden to show this.

patients who did not pay their bills, Hamot aggressively pursued every avenue of the collection process. We do not see how this establishes the type of open admissions policy that existed in *West Allegheny*. Based upon the trial court's finding as to the lack of an open admissions policy and Hamot's attempts to collect from non-paying patients, we must conclude that the facts in this case are distinguishable from *West Allegheny*.

The question then becomes whether Hamot meets the criteria set forth in *Hospital Utilization Project*. With regard to the first prong, the advancement of a charitable purpose, the trial court found that Hamot's community education programs were promotional in nature and done with the intent of securing additional paying patients. It further rejected Hamot's arguments that its urban renewal projects and community education efforts advance a charitable purpose. Opining that "neither of these theories fall within Hamot's original charitable purpose of promoting health," the court also noted that with respect to urban renewal the ventures were accomplished primarily through HHSI subsidiaries, not by Hamot alone. Trial court opinion p. 19.

With respect to the second prong of the *Hospital Utilization Project* test, the court indicated that Hamot did not donate or render gratuitously a substantial portion of its services. We note that whether or not the portion donated or rendered gratuitously is substantial is a determination to be made on the totality of the circumstances surrounding the organization. *Hospital Utilization Project*, 507 Pa. at 19 n. 9, 487 A.2d 1315 n. 9. It must appear from the facts of the case that the organization has made a bonafide effort to serve *primarily* those who cannot afford the usual fee. *Id.* The trial court opined that (a) because the rates of paying patients are used to cover Hamot's losses; (b) because Hamot's treatment of the medically indigent is mandated by statute instead of incurred voluntarily; (c) because Hamot's treatment of Medicare–Medicaid patients is to some extent reimbursed; and, (d) because Hamot has partic-

ipated in lawsuits against Medicaid for higher reimbursement levels, it does not donate or render gratuitously a substantial portion of its services. In addition, the trial court observed that "[t]he fact of Hamot's copious profit margin in part negates a claim that they service *"primarily* those who cannot afford the usual fee."* Trial court opinion p. 22 (emphasis in original). It determined that Hamot's community education programs and giveaways were nothing but "loss leaders" offered to attract customers for higher paying items and that anything which Hamot "gives away" always has the hospital's name and logo prominently displayed.

Next, the trial court opined that Hamot failed to meet the third prong of the *Hospital Utilization Project* test, *i.e.,* that it benefit a substantial and indefinite class of persons who are legitimate subjects of charity, essentially because it found that Hamot had a profit motive. Specifically, the court wrote "[Hamot] accepts defeat only after collection and execution processes fail to yield fruit. [Hamot's] charity is determined when the debt is deemed uncollectible, not prospectively upon admittance. [Hamot] fully anticipates payment at the time of admittance." Trial court opinion pp. 24–25.

The trial court agreed that Hamot did meet the fourth prong of the *Hospital Utilization Project* test because it did relieve the government of some of its burden.[7] But, as to the fifth prong of the *Hospital Utilization Project* test, the court clearly indicated that HMC does not operate entirely free from a private profit motive.

There is no dispute that there is evidence of record to support the trial court's findings. Rather, Hamot is dissatisfied with the way the trial court chose to interpret the testimony. Such matters as weight and fact finding are for the trial court to decide. *Board of Pensions and Retirement v. Einhorn,* 65 Pa.Commonwealth Ct. 144, 442 A.2d

7. The entity seeking the exemption must meet all five criteria. *See G.D.L. Plaza; Scripture Union v. Deitch,* 132 Pa.Commonwealth Ct. 134, 572 A.2d 51 (1990).

21 (1982). And in view of the fact that the findings are supported by substantial evidence, there is no basis for a reversal of the trial court's order.

Accordingly, based upon the foregoing opinion, we affirm the order of the common pleas court.[8]

PELLEGRINI, J., did not participate in the decision in this case.

### ORDER

NOW, January 9, 1992, the order of the Court of Common Pleas of Erie County in the above-captioned matter is hereby affirmed.

---

**8.** Because of our disposition of this case, we need not decide whether Hamot meets the *statutory* criteria entitling it to an exemption.