**WILSON AREA SCHOOL DISTRICT, Borough of Wilson, and Northampton County**

v.

**EASTON HOSPITAL.**

**Appeal of WILSON AREA SCHOOL DISTRICT, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1997.

Decided Jan. 26, 1998.

Donald F. Spry, II, Bangor, for appellants.

Roland Morris, Philadelphia, for appellee.

Before DOYLE and FRIEDMAN, JJ., and LORD, Senior Judge.

FRIEDMAN, Judge.

The Wilson Area School District (School District) appeals from a December 6, 1996 order of the Court of Common Pleas of Northampton County (trial court) denying and dismissing the appeal filed by the School District, the Borough of Wilson and Northampton County, (collectively, Taxing Authorities), and granting Easton Hospital (Easton) tax exempt status for real estate tax purposes for the years 1990 through 1995.[1] We affirm.

Easton is a community hospital founded and maintained by charity. Located in the Borough of Wilson, Northampton County, Easton is a non-profit Pennsylvania corporation which serves as an acute-care facility with an "open admission policy," as well as being a teaching institution.[2] Easton owns

---

1. The trial court's December 6, 1996 order superseded an earlier order, dated January 26, 1996, in which the trial court sustained the Taxing Authorities' appeal for tax years 1993 and 1994, concluding that Easton was not entitled to tax exempt status for real estate taxes for those years, but denied and dismissed the Taxing Authorities' appeal as to tax years 1990, 1991, 1992 and 1995, determining that Easton was entitled to tax exempt status for real estate tax purposes for those tax years.

2. Easton was founded in 1890, and its charter provides that it was formed to relieve human suffering by ministering to the sick and injured without distinction of race, creed, color or condition. Through its open admission policy, Easton has never declined to provide medically necessary treatment to a patient unable to pay for it.

four tax-exempt properties[3] and five taxable properties.[4] (January 26, 1996 decision, Findings of Fact, Nos. 1–7.)

On August 9, 1989, the School District filed a challenge to Easton's tax-exempt status for real estate tax purposes under section 204(a)(3) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3), and the Borough of Wilson and Northampton County joined the appeal. The tax years at issue here are 1990–1995. During those years, Easton donated or gratuitously rendered for the benefit of the community services valued at approximately: $5,536,000 in 1990; $6,937,000 in 1991; $8,661,000 in 1992; $7,639,000 in 1993; and $8,620,000 in 1994. These figures represent the total value of Easton's services, including uncompensated care in the form of traditional charity care, Medicaid and Medicare shortfalls and bad debt expenses,[5] as well as hospital sponsored community activities, such as pastoral care, Meals–on–Wheels, social services, and community service and education programs.[6] (January 26, 1996 decision, Findings of Fact, Nos. 16–36.) Considering Easton's annual operating expenses, which ranged from $68 million to $94 million during 1990–1994, (January 26, 1996 decision, Findings of Fact, No. 37), Easton's net income ranged annually between $456,000 and $3,129,000 during the relevant years, so that in each of those years, Easton's donations to the community exceeded Easton's net income by a significant margin. (January 26, 1996 decision, Findings of Fact, Nos. 38–39.) Easton's donations to the community also exceeded contributions and bequests made to Easton from the community. (January 26, 1996 decision, Findings of Fact, No. 40.)

In 1986, Easton created Valley Health as a parent corporation to assist Easton in managing matters related to non-acute health

---

In 1909, Easton began providing free dental care to the poor, a service which it still continues through its Ambulatory Care Clinic. Easton maintains formal charity care procedures to determine whether patients are eligible for free care, with guidelines set at twice the federal poverty guidelines; such eligibility is determined only after care has been rendered. (January 26, 1996 decision, Findings of Fact, Nos. 6–14.)

3. The four challenged properties include the hospital, Outlook House, a macadam parking lot and a clinic with a parking garage. (January 26, 1996 decision, Findings of Fact, No. 4.)

4. Additional properties are owned by Easton's parent organization, Valley Health, and by other subsidiaries of Valley Health. (January 26, 1996 decision, Findings of Fact, No. 5.)

5. Approximately 61% of Easton's patients do not or cannot pay their full cost of care. (January 26, 1996 decision, Findings of Fact, No. 42.) On an annual basis, the cost to Easton of its traditional charity care, rendered to eligible patients entirely free of charge, has ranged from $933,000 to $1,532,000 during 1990 to 1994. (January 26, 1996 decision, Findings of Fact, No. 16.) Easton also provides care to indigent patients under the Pennsylvania Medical Assistance Program (Medicaid). Medicaid patients represent approximately 8.4% of the total of Easton's patients and, although Easton receives government reimbursements, these amounts fall short of paying for their care. The services which Easton provided to Medicaid patients which were not covered ranged between $611,000 and $1,874,000 between 1990 and 1994. (January 26, 1996 decision, Findings of Fact, Nos. 17–18, 21.) Additionally, Easton provides care to the elderly and disabled under the Federal Medicare program. Again, Easton must subsidize the cost of care for its Medicare patients, which represent approximately 51% of Easton's patients, because government reimbursements fall short of paying for their care. The shortfalls in reimbursement to Easton for services provided to its Medicare patients ranged between $1,881,000 and $4,493,000 from 1990 to 1994. (January 26, 1996 decision, Findings of Fact, Nos. 19–20, 22.) Finally, due to its open admissions policy, Easton expects that a certain amount of its billed care to uninsured patients who are ineligible for charity will go unpaid. Easton writes off this free care as bad debt expenses, an amount which has ranged from $1,368,000 to $2,192,000 during 1990–1994. (January 26, 1996, Findings of Fact, Nos. 23–24.)

6. Easton provides pastoral care to its patients free of charge as part of its charitable mission, resulting in donations between $79,000 and $118,000 during 1990 to 1994. (January 26, 1996 decision, Findings of Fact, Nos. 25–27.) Easton's Meals–On–Wheels program, which provides nutritious meals to the elderly and disabled, cost Easton between $106,000 and $382,000 during 1990 to 1994. (January 26, 1996 decision, Findings of Fact, Nos. 28–29.) Easton's social services donations ranged between $4,000 and $7,000 during 1990 to 1994, and its community service and education programs cost Easton between $23,000 and $62,000 during 1990 to 1994. (January 26, 1996 decision, Findings of Fact, Nos. 30–33.)

care. Valley Health, which operates a foundation to raise money for Easton and other charitable undertakings, was followed in turn by the creation of other Valley Health subsidiaries: Valley Health Services, Inc., a for-profit corporation, (1987); Valley Health Foundation (1987); Valley Health Employee Health Network (1993); and Valley Health Community Medical Services (1994), (together, Valley Health System). One of the reasons for the creation of this Valley Health System was to conduct fund raising and for-profit activities. Since the creation of the Valley Health System, Easton has made sizable loans to Valley Health and its subsidiaries, many without expectation of repayment.[7] (*See* January 26, 1996 decision, Findings of Fact, Nos. 55–58.)

Following hearings on the Taxing Authorities' appeal,[8] the trial court made numerous findings and then, applying the test set forth in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*), determined that Easton had satisfied its burden of establishing that it is a "purely public charity" within the meaning of Article VIII, Section 2(a)(v) of the Pennsylvania Constitution. However, the trial court concluded that Easton failed to meet the statutory tax exemption requirements in section 204(a)(3) of the Assessment Law for the years 1993 and 1994. The trial

court considered a $200,000 loan by Easton to Valley Health in 1993 and a $700,000 loan by Easton to Valley Health Services, Inc. in 1994, made without expectation of repayment, to be revenues diverted beyond Easton's core, tax-exempt, i.e., acute care, activities and facilities to projects in other areas of health care. Accordingly, by order dated January 26, 1996, the trial court sustained the Taxing Authorities' appeal as to tax years 1993 and 1994 but otherwise dismissed their appeal, holding that Easton was entitled to tax exempt status for real estate purposes for tax years 1990, 1991, 1992 and 1995.

 Upon petition from Easton, the trial court permitted rehearing on the issue of the statutory tax exemption. The trial court held further hearings and reconsidered four separate transfers of Easton's funds identified by the Taxing Authorities as not meeting the statutory exemption requirement that all revenues be applied to support or increase the efficiency of Easton's tax-exempt activities or facilities. Finding that these expenditures satisfied the statutory exemption requirements, the trial court issued its December 6, 1996 order denying and dismissing the Taxing Authorities' entire appeal and granting Easton tax exempt status for real estate tax purposes for all the tax years in question. The School District now appeals to this court.[9]

7. Easton is the only entity in the Valley Health System to realize a profit (other than minor investment income by Valley Health). (January 26, 1996 decision, Findings of Fact, No. 57.) In this regard, the trial court recognized that Easton, which is highly regulated and subject to numerous regulatory controls by various national, state and local organizations, had to generate a positive bottom line if it was to continue to carry out its charitable mission in the community; the trial court also noted that the operating margin which Easton allowed itself was less than that recommended by financial experts. (January 26, 1996 decision, Findings of Fact, Nos. 47, 49–51.)

In addition, the trial court found that neither Easton's trustees, nor the trustees of any other organization related to the hospital, receive any compensation for their services, that Easton's salaried officers and staff are not paid bonuses or incentives, and that Easton's management salaries are reasonable and not excessive. (January 26, 1996 decision, Findings of Fact, Nos. 43–45, 54.) The trial court also found that Easton's

trustees expend substantial time supervising the hospital's operations and were knowledgeable concerning the hospital's key decisions. The trustees also appropriately articulated the hospital's budgeting philosophy and its reasons for generating various levels of income in relation to the charitable reasons for the hospital's activities. (January 26, 1996 decision, Findings of Fact, Nos. 43, 48.)

8. Easton and the Taxing Authorities agreed to waive a hearing before the Northampton County Revenue Appeals Board and present the case to the trial court *de novo*.

9. This court's scope of review in a real estate tax assessment appeal is limited to determining whether the trial court abused its discretion or committed an error of law, and whether the trial court's findings of fact are supported by substantial evidence. *Pennsylvania Easter Seal Soc'y Appeal*, 67 Pa.Cmwlth. 94, 445 A.2d 1369 (1982). Further, the question of entitlement to a real estate tax exemption is a mixed question of law and fact and, absent an abuse of discretion or a

On appeal, the School District argues that the trial court erred in concluding that Easton had established its entitlement to a real estate tax-exemption because Easton: (1) does not satisfy the five prong test in *HUP* establishing it as a purely public charity; and (2) does not meet the statutory requirements for exemptions from real estate taxes under section 204(a)(3) of the Assessment Law. We disagree with both of the School District's arguments.

In *HUP*, our supreme court noted that under Article VIII, section 2(a)(v) of the Pennsylvania Constitution, the General Assembly is empowered to confer tax exempt status to "[i]nstitutions of purely public charity." The court then developed the criteria for qualifying as a purely public charity, setting forth a five prong test which must be met by any entity seeking such classification in order to be exempted from real estate taxation. The court concluded that an entity qualifies as a purely public charity if it possesses the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*Id.* at 21–22, 487 A.2d at 1317.

■ Any organization seeking exemption as a purely public charity has the burden to prove its entitlement by establishing that its operation satisfies all five of these criteria. If it succeeds, the entity must next establish that it meets the statutory requirements of section 204(a)(3) of the Assessment Law,

which provides a real estate tax exemption for:

[a]ll hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity ... founded, endowed and maintained by public or private charity: *Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose* ....

72 P.S. § 5020–204(a)(3) (emphasis added). This provision exempting property as a charitable institution is subject to strict construction. *Marple Newtown School Dist. v. The Devereux Found.*, 39 Pa.Cmwlth. 326, 395 A.2d 1023 (1978). With these standards in mind, we address the issues raised by the School District for our review.

## I. Purely Public Charity

The School District first argues that the trial court erred in concluding that Easton satisfied all five prongs of the *HUP* test and, thus, qualifies as a purely public charity. Specifically, the School District contends that Easton fails to meet the second and fifth criteria because it does not donate or render gratuitously a substantial portion of its services, and it does not operate entirely free from private profit motive.[10]

### A. Donation of a Substantial Portion of Services

■ The School District concedes that Easton has a laudable mission statement and operates under an open admission policy; nevertheless, it contends that, under the totality of the circumstances, Easton does not donate what can be viewed as a substantial portion of its services.[11] The crux of the

---

lack of supporting evidence, we will not disturb the decision of the trial judge considering the question of entitlement to a tax exemption as a purely public charity on appeal. *Appeal of Bucks County Board of Assessment Appeals*, 55 Pa. Cmwlth. 195, 423 A.2d 760 (1980).

10. The School District does not challenge the trial court's conclusions that Easton satisfied the other three prongs of the *HUP* test. Indeed, prior to trial, the parties stipulated that Easton

advances a charitable purpose and relieves the government of some of its burden.

11. A determination of whether or not the portion of services donated or rendered gratuitously is substantial, should be based upon the totality of the circumstances surrounding the organization. *School District of the City of Erie v. Hamot Medical Ctr. of the City of Erie*, 144 Pa.Cmwlth. 668, 602 A.2d 407 (1992), citing *HUP*. It must appear from the facts of the case that the organization

School District's argument is that, in calculating Easton's gratuitous services to conclude that Easton donated a "substantial" portion of its services, thus satisfying the second prong of the *HUP* test, the trial court inflated the amount of Easton's donations. The School District maintains that the trial court merely speculated as to the amount of traditional charity care Easton provided to the community and improperly included emergency room costs, bad debt expenses and hospital sponsored community programs and amenities in the calculation.

To support this argument, the School District contends that there was no evidence regarding how much of Easton's uncompensated care was attributable to legally required emergency room procedures or reclassification of bad debts. The School District points out that all Pennsylvania hospitals are required to perform emergency services to those who cannot afford it as a condition of licensure and, thus, the fact that Easton provides such emergency services does not set it apart from other for-profit hospitals as a purely public charity. Further, the School District suggests that the inclusion of bad debts amounts to ex post facto charity because Easton fully anticipates payment at the time of admission and only deems such losses as charity after all attempts at collection have failed. With regard to the majority of Easton's community services,[12] the School District argues that these are nothing more than marketing devices, analogous to loss leaders, directed at attracting paying patients rather than servicing indigent patients and, thus, should not be viewed as gratuitously rendered services.

According to the School District's calculations, Easton's traditional charity for the years at issue never exceeded 1.7% of its net patient service revenue, a percentage the School District claims is no different than that provided by many for-profit hospitals. Moreover, the School District asserts that, even when considering traditional charity care, Medicare and Medicaid shortfalls, Meals–On–Wheels, social services and expenses for volunteers, the total amount of Easton's "charity" ranged only between 6.1% and 8% of net patient service revenue for the period in question. The School District argues that these figures hardly represent a substantial donation or gratuitous rendering of services, a claim it supports with reference to *St. Margaret Seneca Place v. Board of Property Assessment Appeals and Review, County of Allegheny*, 536 Pa. 478, 640 A.2d 380 (1994).[13] For the following reasons, we believe that the School District's reasoning is flawed.

Initially, with regard to those items which the School District would exclude from a valuation of Easton's contributions to the community, we recognize that hospitals are now required to provide emergency room service;[14] however, we see no reason why this should make us blind to the fact that Easton actually rendered the emergency room care free of charge, and so should have that service credited as a donation to the community.[15] As to the reclassification of bad debts as charitable care, we agree with the trial court that the cost of uncollected billings is properly included as part of Easton's community donations. Easton should not forfeit its tax-exempt status merely because it attempts to run the hospital effi-

has made a bona fide effort to serve *primarily* those who cannot afford the usual fee. *Id.*

**12.** The School District excludes Meals–On–Wheels, social services and expenses for volunteers, recognizing these donations as charitable.

**13.** *St. Margaret Seneca* involved a nursing home which operated at an actual loss, while still donating significant gratuitous services by providing care for nearly half of its residents who were only partially paid for by Medicaid, and by continuing to care for many residents who would eventually exhaust their means of payment. The

School District reasons that because Easton donates a much smaller percentage of its net patient revenue than the nursing home in *St. Margaret Seneca*, Easton fails to meet the second prong of the *HUP* test.

**14.** *See* section 8 of the Health Care Cost Containment Act, Act of July 8, 1986, P.L. 408, *as amended*, 35 P.S. § 449.8.

**15.** Further, we note that Easton provided such emergency service before it was required by law and, thus, Easton rendered the service from a charitable, rather than legal, motive.

ciently by seeking payment of bills before belatedly accepting the fact that the care rendered must be deemed free care. Indeed, such bad debts are properly understood as donated services because Easton expects that each year a certain amount of its services will not be reimbursed, yet it willingly accepts the write-off by continuing to treat uninsured patients, including those with bad payment histories where Easton has no realistic expectation of receipt.[16]

Finally, we note that the School District has devised a substantiality formula which assesses Easton's contributions as a percentage of net revenues, whereas the trial court used other means of determining whether Easton donated a substantial portion of its services. In its brief, Easton points out that its donations would be substantial even using the substantiality formula devised by the Taxing Authorities' expert, i.e., 5% of net revenues, (R.R. at 1073a), so that under the more appropriate tests used by the courts and Easton's experts,[17] Easton easily satis-

fies the second prong of the *HUP* test. We agree.

■ In summary, we note that the trial court based its conclusion that Easton donates or renders gratuitously a substantial portion of its services on its findings that: (1) Easton's donations to the community are far greater than Easton's net income; (2) Easton's donations *to the community* exceed the amount of donations to Easton *from the community;* and (3) Easton's donations to the community fluctuate between 8% and 10% of its total operating expenses. Because these findings are fully supported by the record, the trial court acted well within its discretion in concluding that Easton made substantial service donations to the community, thereby satisfying the second prong of the *HUP* test.

## B. Operation Free From Profit Motive

The School District also asserts that, because Easton does not operate entirely free

---

**16.** The School District notes that the trial court relies on several cases from counties in Pennsylvania for the proposition that bad debt can be considered a contribution to the community. Although conceding that these cases do stand for this proposition, the School District contends that in *School District of the City of Erie v. Hamot Medical Ctr. of the City of Erie,* 144 Pa.Cmwlth. 668, 602 A.2d 407 (1992), the only appellate case which addresses the issue, this court impliedly rejected the argument that bad debt should be included in a calculation of gratuitous services. Even if we were to agree with this reading of *Hamot,* we cannot agree that it controls in the present case because the hospital in *Hamot,* unlike Easton here, was not found to operate under an open admissions policy.

In *Hamot,* we considered whether Hamot Medical Center qualified as a "purely public charity" under both the *HUP* test and the standard set forth in *West Allegheny Hosp. v. Board of Property Assessment,* 500 Pa. 236, 455 A.2d 1170 (1982). In *West Allegheny,* our supreme court determined that the West Allegheny Hospital was a "purely public charity" within the meaning of Article VIII, Section 2 of the Pennsylvania Constitution, basing that determination on the fact that, since its inception, West Allegheny Hospital had maintained an open admissions policy which provided comprehensive health care without regard to a patient's ability to pay. Hamot Medical Center argued that because it also had an open admissions policy, it was entitled to tax-exempt status under *West Allegheny.*

We disagreed and distinguished *Hamot* from *West Allegheny.* We noted that the trial court in *Hamot* did not find that Hamot Medical Center

had an open admissions policy. We also determined that Hamot Medical Center's provision of emergency medical care, which was required by law, and its aggressive pursuit of bill collection from non-paying patients, could not establish the type of open admissions policy which existed in *West Allegheny,* particularly where there was no indication that Hamot Medical Center provided non-emergency services to people who it knows cannot pay for them.

In stark contrast to the circumstances in *Hamot,* the trial court here specifically found, and the School District does not dispute, that Easton has operated under an open admissions policy from its inception. In addition, the record clearly establishes that Easton provides non-emergency services to patients without regard to their ability to pay.

**17.** In these tests, Easton's donations to the community are compared to net income, (Easton's donations were 496%, 306% and 276% of net income for the years 1992, 1993 and 1994 respectively), operating expenses, (Easton's donations represented 9.8% of operating expenses in 1994 and between 9.2% and 11.5% during the other tax years at issue), other donations, (by comparison to United Way efforts, contributions of local political subdivisions and community donations from for-profit hospitals, Easton's donations were "substantial"), and donations to Easton, (Easton's donations to the community far exceeded contributions from the community to Easton).

from profit motive, it fails to meet the fifth prong of the *HUP* test and that the trial court abused its discretion and misapplied the law in concluding otherwise. In support of this position, the School District argues that Easton repeatedly has generated profits and increased its fund balance, but, instead of using these profits to reduce patient costs or increase charitable contributions to the community, Easton has made loans and contributions in excess of $3,320,000 to its parent company and other Valley Health System affiliates to fund for-profit activities in competition with private sector businesses.[18] Because of Easton's involvement with these for-profit enterprises, the School District contends that Easton should not enjoy the taxpayer sponsored competitive edge that a real estate tax exemption would provide.[19] The School District acknowledges that no financial benefits or profits inured to any private individuals as a result of Easton's activities;

however, given Easton's use of its profits, the School District maintains that Easton cannot be distinguished from for-profit hospitals because, like those other hospitals, Easton is run as a business with a private profit motive; thus, it should be taxed accordingly. Again, we disagree.

While concerned that a complex hospital organization, such as the one in which Easton participates, potentially may involve revenue flow to non-charitable entities, the trial court concluded that the structure alone should not disqualify an otherwise charitable hospital from tax-exempt status. Rather, the trial court determined that

[t]he constitutional question is not whether Easton Hospital generates surpluses over expenses, not whether it is associated with for-profit enterprises, and not whether Easton Hospital or its affiliates compete with business. Rather the ultimate inquiry is

18. The School District maintains that, during the period in question, Easton garnered profits of between $3,129,249 (1994) and $204,992 (1992), and Easton's fund balance hovered between $29,217,557 (1992) and $34,667,841 (1994), with over $16,000,000 of this in liquid assets. At the same time, Easton transferred considerable sums to Valley Health and its subsidiaries, and most of this money went to subsidiaries that compete directly in the private sector.

19. Specifically, the School District points to the transfer of funds to capitalize Valley Health Services, Inc., a for-profit corporation of the Valley Health System. Valley Health Services, Inc., in turn, has engaged in a rental business, entered into a partnership to sell medical equipment, and entered into an agreement with Easton to collect patient accounts. In addition, Easton loaned the for-profit enterprise money to repay the debt incurred in the construction of the Wind Gap medical facility which was ultimately abandoned because it did not make money. Finally, the School District contends that Easton acts as a business seeking profit when it funds the purchase of physicians' practices and enters into employment agreements with the physicians that include non-competition clauses.

On the other hand, Easton contends that the School District's examples cannot withstand close scrutiny. As to the complaint that Easton invests in some operations that compete with for-profit businesses, Easton notes that all charities with liquid funds invest those funds for returns in order to enhance its charitable capabilities, and, indeed, Easton would breach its fiduciary duty if it did not do so. Moreover, these investments will almost always be in for-profit businesses. Thus, where, as here, any yields inure to Easton,

and not a private interest, the School District's argument is without merit.

Easton also responds to the School District's criticism of the hospital's investment in outreach services as loss leader advertising warranting attribution of a private profit motive to Easton. Easton points out that one of these services, a community clinic, provides care to thousands of disadvantaged patients per year, (*see* January 26, 1996 decision, Findings of Fact, No. 41); the fact that for-profit organizations may also provide similar services does not mean that Easton's services are not donated or that Easton's motivation is for-profit rather than charitable. Easton applies similar reasoning to the use of hospital funds to open a clinic in Wind Gap, which was later closed because it proved to be a drain on hospital assets. Easton contends that there was no profit motive in making an attempt to serve an underserved community and that keeping the Wind Gap clinic open would have been a negligent waste of hospital funds. Finally, Easton contends that the School District's criticism of its purchase of two physicians' practices also must fail because, as the record demonstrates, Easton employed these physicians and acquired their practices so they would not leave the community; indeed, the acquisition provides additional primary care to the community and reduces the use of Easton's emergency room, which is an expensive mode of treatment. Easton also maintains that the non-competition clauses attendant to these acquisitions cannot impart a profit motive to Easton. Easton argues that it was merely fulfilling its duty to protect and preserve the hospital's assets and, in fact, failure to fulfill this duty would violate the trustees' obligations to the charity.

whether the revenues of Easton Hospital are applied only to charitable purposes instead of to private gain.

(January 26, 1996 trial court op. at 24–25.)

 Applying this analysis, the trial court concluded that the record here demonstrated no application of Easton's revenues to private gain. The trial court based its conclusion on the fact that: no individual benefits from Easton's revenues; neither the trustees of Easton nor any affiliate receive compensation; salaried hospital officers and staff receive fair compensation based on services rendered, with no bonuses based on the hospital's prosperity; transfers to the for-profit Valley Health Services, Inc. were loans which are being repaid; funds from Easton's investment in the credit market were used to attempt development of a health care facility in an underserved area; and neither the for-profit nor the non-profit affiliates have made a net profit themselves. Considering these findings, the trial court was satisfied that the structure of Easton and its affiliates did not evince a private profit motive and, thus, held that Easton satisfied the fifth prong of the *HUP* test. We believe that the trial court's analysis was appropriate, and because its determination was properly drawn from specific findings, all of which are fully supported by the record, the trial court did not abuse its discretion in reaching that determination.

## II. Tax Exemption

Next, the School District argues that, because Easton diverted funds from the hospital to the private sector, and so did not utilize its profits to increase the efficiency of its facilities, it does not meet the requirements for a statutory exemption from real estate taxes under section 204(a)(3) of the Assessment Law, which exempts those hospitals which are charitably maintained where the entire revenue is applied for no purpose other than to support and to increase the efficiency and facilities of the hospital itself. Indeed, the School District points out that the trial court, in its January 26, 1996 order, reached the same conclusion. At that time, reasoning that the tax exemption was intended to defray the costs of buildings, equipment and personnel dedicated to Easton's *core activity of acute care*, the trial court found that Easton did not pass the "core test" analysis for 1993 and 1994 when Easton loaned money to Valley Health and its subsidiaries to support types of health care other than Easton's acute care activities and facilities.

Upon reconsideration, however, the trial court recognized that the nature of health care has shifted away from expensive, acute care in an institution toward earlier, less complicated care in or near a patient's home. With hospitals now moving toward managed care, they are applying revenues to develop less expensive, more benevolent delivery of health care. In light of this new movement, the trial court expanded its "core test" analysis and held that, in determining the propriety of a hospital's tax exemption, it must assess the application of a hospital's revenues to promote community goals of efficiency and well-being through these other avenues of health care to determine if a statutory real estate exemption is warranted. Adopting this approach, the trial court then specifically considered four of Easton's revenue transfers:

(1) a $200,000 loan from Easton to Valley Health, (the A.1 Transaction), composed of $40,000 used to capitalize the parent corporation, Valley Health, and $160,000 used to capitalize the Valley Health Employee Health Network, which provides outpatient medical and occupational health services;

(2) a $700,000 loan, (the A.2 Transaction), more accurately described as an $876,956 capitalization of Valley Health Community Medical Services, used to purchase two family medical practices;

(3) a $308,000 purchase of stock of Valley Health Services, Inc. by Valley Health, (the B. Transaction); and

(4) a loan of $700,000 in 1994, (the C. Transaction), more accurately described as a loan of $684,008 by Easton to Valley Health Services, Inc. to discharge the bank debt related to the Wind Gap Family Care Center.

(*See* December 6, 1996 decision, Findings of Fact, Nos. 1, 4, 7–8, 13, 14.)

After reviewing these challenged transactions, the trial court specifically found that they each satisfied the statutory requirement for a real estate tax exemption set forth in section 204(a)(3) of the Assessment Law.[20] In sum, the trial court found all of Easton's actions during the years at issue satisfied the statutory criteria requiring that Easton's entire revenue be applied to the hospital's support, to increase its efficiency and facilities, and to repair and make necessary increases of the hospital's grounds and buildings. (December 6, 1996 decision, Findings of Fact, No. 17.) However, because it deferred to the decision of the charity, the trial court declined to decide whether increased efficiency was the primary purpose of the transfer and whether there would have been an even more efficient way to return the value to the community.

■ In large part, the School District does not question the trial court's findings; rather, it suggests that the trial court erred in deferring to the decision of the charity's governing body, thereby declining to determine Easton's motive for entering into the challenged transactions or to determine whether Easton's actions were the most efficient ways to return value to the community. The School District maintains that, by refusing to determine motive, the trial court's analysis does not comport with the strict construction that must be given such statutes

---

**20.** In this regard, the trial made the following findings:

2. The use of the aforesaid $40,000.00 by the parent, Valley Health, supported [Easton] by administrative efficiency in the separation of functions and the management of such entities as the Hospital Foundation, which in turn distributed funds to [Easton].

3. This $40,000.00 transaction also increased efficiency by facilitating leadership, administrative efficiency, and distribution of planned surpluses to [Easton].

4. The $160,000.00 transaction of the 1993 $200,000.00 transfer was used to capitalize the Valley Health Employee Health Network, which provides outpatient medical and occupational health services to the community.

5. Outpatient medical and occupational health services for the community contribute to the support, the efficiency, and the facilities of [Easton]: the early provision of such services eliminates or diminishes the need for later expensive inpatient (sometimes acute) care which develops if early outpatient treatment of various occupational health problems does not transpire.

6. The operation of an outpatient medical and occupational health service also reduces inappropriate and expensive emergency room utilization. The operation of such outpatient medical and occupational health services thereby increases the efficiency of [Easton].

8. The A.2 Transaction funds were used to purchase two family practices. The transaction supported [Easton] by assuring an instructional site with residency training programs in the building acquired, by permitting Medicaid managed-care contracting, by serving low income and underserved populations, and by reducing inappropriate hospitalizations which occur when patients without primary-care physicians utilize expensive emergency room services.

9. In recent decades there has been a shortage of primary-care physicians in the country and in the Lehigh Valley. In order to assure a sufficiency of primary-care physicians in their communities, the majority of hospitals nationally and in Pennsylvania have acquired primary-care physicians (directly or through related entities) for the direct purpose of assuring appropriate health care in their communities and thereby improving the efficiency of the hospitals.

10. Easton Hospital acquired two primary-care physician practices for the purpose of increasing its efficiency, facilities, and buildings and grounds.

11. The A.2 Transaction also increased the efficiency of [Easton] and increased its facilities, both tangible and intangible. The tangible facilities included buildings and grounds to support the provision of primary-care.

12. The A.2 Transaction was completed for the purpose of supporting [Easton], increasing its efficiency, increasing its facilities, as well as obtaining additional buildings and grounds.

15. The Wind Gap Family Care Center program, which was funded in part by the B. and C. Transactions, was designed to establish a medical care family center in an underprivileged and inadequately served area.

16. The need for the Wind Gap program was established, but it eventually became too expensive for [Easton] to continue in the scope originally undertaken. The Wind Gap program, as originally envisioned and undertaken, supported [Easton] by eliminating a medical shortage, reducing inappropriate hospitalizations, reducing inappropriate emergency room utilization and providing additional outpatient clinical buildings and grounds. For similar reasons, it increased the efficiency of [Easton] by reducing inappropriate hospitalizations and inappropriate expensive emergency room utilization. Similarly, the C. Transaction increased the facilities of [Easton], both tangible and intangible.

(December 6, 1996 decision, Findings of Fact, Nos. 2–6, 8–12, 15–16.)

and, thus, Easton did not carry its burden of proving that the transfer of funds to its parent corporation and affiliates satisfied the statutory mandate. The School District reasons that, while Easton may want a statutory interpretation to permit charitable boards to move in new directions, the statute does not permit unfettered discretion; because the tax exemption statute is to be strictly construed, any change is for the legislature, not the judiciary.

We do not agree that such a particularized evaluation is required, nor do we believe that the trial court's "broader" interpretation of the statutory language is a "change" requiring legislative action rather than judicial recognition. Although clearly requiring that revenues be applied to support and increase the efficiency of a charity's facilities, where, as here, increased efficiency is established by the record, the statute does not also require a detailed evaluation of a charity's motive or level of efficiency as urged by the School District. Indeed, relevant case law supports a deference to fiduciary decision making of charitable institutions. *See, e.g., In re Swarthmore College*, 165 Pa.Cmwlth. 564, 645 A.2d 470 (1994); *Pennsylvania Easter Seal Soc'y Appeal*, 67 Pa.Cmwlth. 94, 445 A.2d 1369 (1982).

Here, each of the trial court's findings were supported by ample record evidence and the trial court did not err in concluding that Easton satisfied the statutory requirement of section 204(a)(3) of the Assessment Law based upon those findings.

Accordingly, we affirm.

### ORDER

AND NOW, this 26th day of January, 1998, the order of the Court of Common Pleas of Northampton County, dated December 6, 1996, is hereby affirmed.

DOYLE, J., concurs in the result only.

LEADBETTER, J., did not participate in the decision in this case.