526 A.2d 1173

**G.D.L. PLAZA CORPORATION, Appellant,**

**v.**

**COUNCIL ROCK SCHOOL DISTRICT, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1986.

Decided May 22, 1987.

William M. Adshead, Alfred J. Tagliaferri, for appellant.

John A. VanLuvanee, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

OPINION

ZAPPALA, Justice.

The substantive issue in this case is whether property of the Appellant, G.D.L. Plaza Corporation, qualifies for exemption from taxation under Article VIII, Section 2 of the Constitution of the Commonwealth, and the General County Assessment Law, Act of May 22, 1933, P.L. 853, Art. II, *as amended*, 72 P.S. § 5020-204(a)(3). We granted allowance of appeal to consider whether Commonwealth Court exceeded the proper scope of its review in denying the exemption despite the chancellor's finding and holding to the contrary.

By resolution of May 5, 1980, Appellee, Council Rock School District, imposed a residential construction tax of $875.00 per unit on all new construction in the district.[1] Pursuant to the purposes for which it was incorporated, G.D.L. Plaza sought to construct a 111 unit apartment complex for elderly and handicapped persons on property it owned within the district. The corporation claimed exemption from the construction tax as a purely public charity, but because of scheduling necessities related to the

1. This resolution was adopted pursuant to the Local Tax Enabling Act, Act of December 31, 1965, P.L. 1257, 53 P.S. § 6901 et seq. This Act was amended in 1981 to prohibit such residential construction taxes or permit fees, Act of July 1, 1981, P.L. 184, 53 P.S. § 6902(11), although the amendment provided that "any school district which has on or before June 30, 1981, levied, assessed or collected a tax which would otherwise be prohibited ... may continue to levy, assess, and collect, but not increase the amount of the tax until June 30, 1982.

project's financing paid the $97,125 tax under protest and later sought recovery of it in an equity action.

The facts are not in dispute. G.D.L. Plaza Corporation is a non-profit corporation formed by the Gloria Dei Lutheran Church of Huntingdon Valley. The primary purpose of G.D.L. Plaza as stated in the articles of incorporation is "building, owning, operating and maintaining residential facilities designed, planned and equipped to meet the physical, emotional, recreational, social and religious needs of elderly persons at moderate cost; and furnishing, to the limits of its ability to do so, financial security for persons who have been admitted to such facilities by maintaining at less than the regular charges any resident who becomes unable to pay such charges...." Financing for the project was obtained from the federal government through the Department of Housing and Urban Development pursuant to Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q. As a condition of receiving this financing G.D.L. agreed to abide by guidelines of the Department with regard to admission, rental agreements, continuing occupancy, and rental subsidies. Under these guidelines, residence in the project is limited to persons who are at least sixty two years of age and retired, or who are handicapped, and whose income and assets do not exceed certain specified levels. Otherwise admission is open to the public at large on a first-come, first-served basis.

In addition to the construction financing obtained through the Section 202 mortgage, G.D.L. Plaza has entered into an agreement with the Department pursuant to Section 8 of the Housing Act of 1937, *as amended*, 42 U.S.C. § 1437f, with respect to Housing Assistance Payments. Under this program, by establishing the monthly rent for the various units in the project according to guidelines of the Department, G.D.L. is authorized to receive on behalf of eligible residents monthly assistance payments amounting to the difference between twenty five percent of the residents' income and the maximum monthly rent for the unit. All of

the rental units at G.D.L. Plaza are covered by Housing Assistance Payments to some extent.

The chancellor found that G.D.L. Plaza maintains a care program for its residents consisting of emergency call buttons from each apartment answerable 24 hours a day either at the management office or by a resident management couple. The Plaza also provides transportation to assist residents in going to doctors, dentists, places of worship, and the like. It also appears that various counseling services are made available to aid those with family or financial problems and to place those requiring more extensive personal and medical care in appropriate facilities. There is no separate charge for any of these services which are implemented by employees of Gloria Dei Outreach Corporation, a non-profit management corporation formed by the church to manage the Plaza and two other residential facilities for elderly and handicapped people. G.D.O. receives a management fee from the Plaza for its services based on a percentage of the revenue generated by rents received from the tenants and housing assistance payments. Gross rents cover 100% of the Plaza's operating costs. Should a revenue surplus ever accrue, Department regulations, after allowing for retention of a small cash reserve, require that it be applied to the principal obligation or to reduce the gross rents.

Article VIII, § 2(a)(v) of the Pennsylvania Constitution provides that "[t]he General Assembly may by law exempt from taxation ... [i]nstitutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." It is clear from the language of this section, and this Court long ago held, that "[t]he constitution does not, of itself, exempt any property; it merely permits the legislature to do so within certain limits." *Donohugh's Appeal*, 86 Pa. 306, 309 (1878). Pursuant to this authority the General Assembly has acted to exempt from local taxation

"[a]ll ... institutions of learning, benevolence, or charity ... with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, *founded, endowed, and maintained* by public or private charity: Provided, That the entire revenue derived from the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose...."

Act of May 22, 1933, P.L. 853, art. II, § 204(a)(3), as amended, 72 P.S. § 5020–204(a)(3) (Emphasis added). Case law establishes that the limits of the constitutional authority to grant exemption and the exemption actually granted by the legislature are not co-extensive.[2] "[T]o obtain the claimed exemption from taxation, [the appellant] must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity." *Woods School Tax Exemption Case*, 406 Pa. 579, 584, 178 A.2d 600, 602 (1962).

██ Commonwealth Court recognized that the question of whether an institution is one of "purely public charity" is a mixed question of law and fact on which the trial court's decision is binding absent abuse of discretion or lack of supporting evidence. *Hill School Tax Exemption Case*, 370 Pa. 21, 87 A.2d 259 (1952). Such is also true as to the questions whether an institution is founded, endowed and maintained by public or private charity. We have also noted that in such circumstances "prior cases have limited value as precedent," *Presbyterian Homes Tax Exemption*

2. In *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) which involved a different statutory exemption than that presented here, we did not decide whether the organization met the statutory qualifications for the exemption because it failed to meet the constitutional requirements. As a result the legislature lacked authority to grant an exemption which would have extended to the organization, and a statute which purported to do so would have been invalid. *Id.*, 507 Pa. at 12–13, 487 A.2d at 1311–12. The standards set out in *Hospital Utilization Project* reflect the minimum constitutional qualifications for being an appropriate subject of a tax exemption. They do not, of themselves, establish eligibility for exemption.

*Case,* 428 Pa. 145, 149, 236 A.2d 776, 778 (1968), because of the continually changing nature of the concept of charity and the many variable circumstances of time, place, and purpose. Nevertheless, review of other decisions is helpful in identifying some of the criteria and characteristics which are necessary, though not necessarily exclusive or sufficient, to determining the issue.

■ The trial court here identified a number of our cases involving federal low-income housing programs and housing and care facilities for the elderly. It quite properly synthesized as a general principle from these cases that "providing low cost housing for elderly persons *with limited incomes* constitutes a public charity." Opinion at 11. (Emphasis in original). On this basis the court held that "the housing and services provided by G.D.L. Plaza constitute a purely public charity entitled to an exemption...." *Id.* at 15.

■ Commonwealth Court, with the aid of the Opinion of this Court in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (filed after the trial court's decision), examined the findings and determined that there was insufficient evidence to meet the criteria listed in *Hospital Utilization Project* for establishing a "purely public charity." 91 Pa.Cmwlth. 176, 496 A.2d 1298. These criteria were themselves extracted from an exhaustive survey of previous decisions, and the holding in *Hospital Utilization Project* represented no departure from, but rather resulted from "adhere[nce] to the principles established by a long line of prior case law." 507 Pa. at 23, 487 A.2d at 1318. According to these criteria a purely public charity

   a) Advances a charitable purpose;

   b) Donates or renders gratuitously a substantial portion of its services;

   c) Benefits a substantial and indefinite class of persons who are legitimate objects of charity;

   d) Relieves the government of some of its burdens; and

e) Operates entirely free from profit motive.

*Id.*, 507 Pa. at 22, 487 A.2d at 1317.

Commonwealth Court readily acknowledged that G.D.L. Plaza met requirements (a), (c), and (e), but found the evidence lacking as to elements (b) and (d). The court determined that the only real service provided by the Plaza was transportation which it found insufficient in comparison with the "essential care" provided in cases such as *Presbyterian Homes* and *Four Freedoms House of Philadelphia v. City of Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971). It also found that the Plaza failed to relieve the government of any burden, as the entire financial support for the project is derived from the federal government. In this appeal, the Plaza argues that these findings of Commonwealth Court are contrary to the facts as found by the chancellor, disregarding his findings as to the extent of services provided, and thus constitute an overstepping of the proper bounds of the court's review.

It would appear inconsistent that the trial court could base its decision on *Four Freedoms House* and *Presbyterian Homes*, both of which we cited with approval in *Hospital Utilization Project*, yet Commonwealth Court could reverse on the basis of *Hospital Utilization Project* although we said it represented no departure from prior case law. At first blush it appears that *Four Freedoms House* is on all fours with the present case. There, the organization was a non-profit corporation created by labor union impetus to provide low-cost housing for the aged. As with the Plaza, it was constructed with funds obtained by way of a Section 202 mortgage, its officers and directors served without compensation, and it could never accumulate a profit because of government regulations as to the disposition of excess revenue. We found that the status of the institution as a public charity was not even in question. 443 Pa. at 219, 279 A.2d at 157. The only question, we said, was whether the complex was maintained by public or private charity. *Id.* Noting that the rents charged by Four Freedoms House were substantially less than those charged

by similarly situated commercial lessors, we discounted the significance of the fact that the residents paid rents which in total offset the operating costs of the complex. Significantly, we observed that were the charitable tax exemption lost, the complex would either have to close or raise rents, both contrary to the acknowledged charitable purpose.

Because of the great diversity of types of organizations to which they will be applied, it is difficult to assess in advance the relative importance of each of the factors listed in *Hospital Utilization Project*, a fact we acknowledged therein. See, 507 Pa. at 19, n. 9, 487 A.2d at 1315, n. 9. As we have previously noted, in this area prior cases may have little value as precedent. It may be that Commonwealth Court erred in overlooking the chancellor's findings as to the extent of services provided, and in overestimating the degree to which the institution must relieve the government of its burden. (If nothing else it must be said that by undertaking the construction and day to day management of the complex and directly serving the needs of its residents, G.D.L. obviates the necessity of the government providing those services itself.) This, however, does not end the inquiry.

The School District has consistently argued that despite its charitable purpose, the Plaza is not "founded, endowed and maintained by public charity." With this conclusion we must agree.

As the Commonwealth Court found, the entire funding for this project, apart from rents paid by the residents, is derived from the federal government. In *Presbyterian Homes*, the home was established by a fund-raising campaign of the Huntingdon Presbytery which raised more than $340,000. In *Four Freedoms House*, the project was financed with a Section 202 mortgage, but repayment of the mortgage was accomplished solely through revenue generated by the residents' rental payments, at rates found to be lower than fair market rates.[3] In the present case all

3. It appears that a small percentage of the Four Freedoms House residents were eligible for and received federal rent subsidies under a

operating costs of the Plaza not covered by rents paid by the tenants is borne by federal government subsidies. This includes salaries of those who provide the services for the Plaza and the expenses for the services themselves, all of which are channelled through the management fee paid to G.D.O. from revenue obtained from the government subsidies.

Close scrutiny reveals that the foregoing circumstances occur not fortuitously, but by design. The federal government as a matter of policy has provided that the Department shall coordinate the implementation of the Section 202 mortgage loan program and the Section 8 housing assistance payments program. 12 U.S.C. § 1701q(g). Non-profit organizations are thus encouraged to undertake the work of increasing the housing supply for elderly and handicapped people *without assuming any financial risk.*

■■ We note that the maximum monthly rent for Section 8 units, as set by the Department, "shall not *exceed* by more than 10 per centum the fair market rental ... for existing or newly constructed rental dwelling units ... in the market area ..." 42 U.S.C. § 1437f(c)(1) (emphasis added). (It was not established at trial how the rents charged at the Plaza compare with fair market rents in the area, but it may be inferred from the testimony of the project director that the rents were in fact established to the maximum level permitted by the Department. (Notes of Testimony, pp. 93–95)). Even more significant, "[t]he contract shall provide for the Secretary to make additional adjustments in the maximum monthly rent ... to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in *real property taxes,* utility rates, or similar costs...." 42 U.S.C. § 1437f(c)(2)(B) (emphasis added).[4] This of course contrasts sharply with our findings in *Four Freedoms House* that the rents charged,

program other than Section 8, which was enacted several years after our decision in that case.

4. We take cognizance of this statutory inclusion of real estate taxes not to indicate that the Secretary will be required to allow the expense

and paid for *by the tenants,* were substantially lower than market rates, and that denial of the exemption would force the closing of the complex or increase of rent, again paid for by the tenants.   It seems obvious that neither the corporation nor the beneficiaries of the housing service would be adversely affected by subjecting the Plaza property to payment of real estate tax.[5]   As with all other costs, federal subsidies will provide compensation.[6]   For these reasons we hold that G.D.L. Plaza, while undertaking a worthwhile and commendable task for the benefit of the public, is not "maintained by public or private charity" as required by the Assessment Law in order to be entitled to an exemption.   Albeit for slightly different reasons, the Order of the Commonwealth Court will be affirmed.

It is so ordered.

LARSEN, J., filed a dissenting opinion in which HUTCHINSON, J., joined.

in this case but only to demonstrate that the cost of real estate taxes generally is includable in the Secretary's determination of appropriate rent.   In other words the federal program is structured so as to pass federal tax dollars on to the local government through real estate taxes paid by the subsidized project.   The dissent's view that this "makes little sense" is a criticism attached to the design of the federal program, not to our interpretation of the law of charitable exemptions, and its relevance and weight must be assessed accordingly.   We note, however, that this method would appear to offer the advantage of keeping blocks of property devoted to low income housing on the tax rolls, making such uses more attractive and acceptable to local municipalities.

5. The dissent's inference that we thus require a charity to be "on the brink of financial ruin" before recognizing its eligibility for exemption is nothing more than an emotional appeal without substance or foundation in fact or law.   As previously noted, our constitution does not require that the legislature grant any tax exemption to any charity.   In requiring that a charity be founded, endowed and maintained by charity, we do no more than apply the exemption as the legislature has in fact created it.

6. We recognize that government funding for any program, however long established, is never a certainty and is always subject to modification or elimination.   Our decision is based only on the facts of record and the federal law as it existed at the time this action was commenced (and as it presently exists).   Under other circumstances and under a different operational scheme, a different conclusion might be justified.

LARSEN, Justice, dissenting.

The majority states that appellant, G.D.L. Plaza Corporation, "while undertaking a worthwhile and commendable task for the benefit of the public, is not 'maintained by public or private charity' as required by the Assessment Law in order to be entitled to an exemption." Maj.Op. at 64–65. The basis for its conclusion is that all of the criteria listed in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985), for establishing a "purely public charity" have been met in this case, but because appellant is subsidized by the federal government and assumes no financial risk in providing its services, it is not an institution that is maintained by public charity. Because I find that federal funding of a purely public charity does not destroy its charitable purpose, I believe that appellant is maintained by public charity and I hereby dissent.

The majority determines that federal subsidies do not constitute public charity, without defining what the legislature meant when it used the phrase "public charity" in the General County Assessment Law, Act of May 22, 1933, P.L. 853, Art. II, *as amended*, 72 P.S. § 5020–204(a)(3).

This Court has carefully established the criteria for determining when an institution is a "purely public charity" pursuant to Art. VIII, sec. 2(a)(v) of the Pennsylvania Constitution. *Hospital Utilization Project, supra.* The majority concedes that appellant meets all of the criteria for establishing a purely public charity where it states that "Commonwealth Court erred in overlooking the chancellor's findings as to the extent of services provided, and in overestimating the degree to which the institution must relieve the government of its burden." Maj.Op. at 62.[1]

1. The majority cogently notes that the legislature lacks the authority to extend a tax exemption to entities that do not pass constitutional muster as purely public charities. Maj.Op. at 59, n. 2. The question remains, however, as to whether the legislature may limit what *is* a public charity once it has exercised its authority under the Constitution to exempt public charities from taxation.

Then, the majority looks to the second and third prongs of the *Woods School Tax Exemption Case,* 406 Pa. 579, 178 A.2d 600 (1962), and determines that federal subsidies and financial viability remove appellant from the category of institutions exempt from taxation pursuant to legislative enactment.

It is important to recall why "only certain institutions are relieved of their normal tax load. The legislature has recognized by this statute that some organizations actually serve a public, rather than a private, purpose, and should be relieved of their tax burden accordingly." *Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 623, 258 A.2d 850, 852 (1969). Appellant, in the case sub judice, serves a public purpose, as the majority acknowledges. The source of funding has no impact upon the purpose served where, as here, no one realizes any profit from this housing project for the elderly and handicapped with limited means.

This Court has analyzed cases in which federal funds launched varying projects and has implicitly recognized that this source of funding is part of the legislative term "public charity." In the *Woods School Tax Exemption Case, supra,* a construction grant from the federal government contributed to a Child Study, Treatment and Research Center, and yet, this Court found that the institution of learning in that case was "founded in charity."

In *Four Freedoms House of Philadelphia, Inc. v. City of Philadelphia,* 443 Pa. 215, 279 A.2d 155, 157 (1971), construction of low-cost housing for the aged was financed by a federal mortgage. This Court stated that there was no "question that appellant was founded by both public and private charity" and was maintained by public charity. Case law, therefore, does not exclude federally funded projects on the basis of *legislative* exemption from taxation.

The majority states that "neither the corporation nor the beneficiaries of the housing service would be adversely

affected by subjecting the Plaza property to payment of real estate tax," Maj.Op. at 64, and thus implies that a public charity must be on the brink of financial ruin before we will recognize that it is exempt from taxation. The imposition of such an additional requirement is not mandated by the standards set forth in our cases on this issue and imposes an unnecessary burden upon those claiming tax exempt status as a public charity. As our citizenry ages, it is critical that encouragement be given to those agencies *and governmental entities* which assume the responsibility for providing essential services to the elderly with limited means. Turning federal tax dollars approved for low-income housing for the elderly over to a school district for purposes of subsidizing public education makes little sense.[2]

In addition, I take issue with the majority's assumption that the U.S. Department of Housing and Urban Development (HUD) will reimburse appellant in some way for the residential construction tax assessed by appellee, Council Rock School District. The federal statute states that "substantial general *increases* in ... costs" may be compensated for by adjustments in the maximum monthly rent for subsidized units. 42 U.S.C. § 1437f(c)(2)(B) (emphasis added). The residential construction tax herein does not represent an *increase* in real property taxes, therefore HUD would be justified in refusing to adjust the monthly rent upward to absorb this cost.

Accordingly, I would reverse the Order of Commonwealth Court and would affirm the Final Decree of the Chancellor.

HUTCHINSON, J., joins in this dissenting opinion.

2. I note that the county board of assessment granted appellant tax exempt status, effective January 1982, therefore appellant, at least for the year 1983, was not liable for *any* local taxes.