743 A.2d 759

STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

NORTH BALTIMORE CENTER, INC.

No. 5469, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Jan. 4, 2000.

William K. Hammond, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Barry Weiskopf (Hilary J. O'Connor and Tydings & Rosenberg, L.L.P., on the brief), Baltimore, for appellee.

Argued before DAVIS, EYLER and JOHN J. BISHOP (Ret., specially assigned), JJ.

EYLER, Judge.

North Baltimore Center, Inc., appellee, applied to the State Department of Assessments & Taxation, appellant, for a charitable exemption from property tax pursuant to Md.Code, Tax–Prop. § 7–202(b)(1) for the 1996–97 tax year for its building

located at 2221–2227 North Charles Street. Appellee used the building to provide mental health care to the indigent. Appellant denied the exemption on the ground that appellee was not supported by significant charitable donations. Appellee appealed the decision to the Property Tax Assessments Appeals Board for Baltimore City (the "Board"), which affirmed appellant's decision. Appellee appealed to the Maryland Tax Court which, after a hearing, reversed the Board and granted the exemption. Appellant petitioned for judicial review in the Circuit Court for Baltimore City, which affirmed the Tax Court. Appellant appealed to this Court and inquires whether the circuit court erred in affirming the Tax Court's grant of a charitable exemption. Finding no error, we shall affirm.

## Factual Background

Appellee was incorporated in 1969 and is an organization exempt from Federal income taxes under § 501(c)(3) of the Internal Revenue Code. Appellee operates a mental health center at 2221–2227 North Charles Street. Appellee purchased the building in 1996 with funds obtained through a grant from the Mental Health Administration of the State Department of Health and Mental Hygiene and funds obtained through a tax-free bond issue. Appellee provides mental health services on an outpatient basis, mainly to indigents.[1]

Appellee is regulated by the Department of Health and Mental Hygiene as a community health program provider. The Mental Health Administration contracts with mental health providers, including appellee, to fulfill its statutory

---

1. Appellee's stated mission is:

 To promote and provide high quality mental health services to people of all ages who are acutely or chronically ill, physically handicapped, chemically dependent or in crisis, and to children and adolescents with emotional or behavioral difficulties. It is further the mission of the Center to provide leadership in educating the public to understand mental illness; to publicize and encourage the use of preventive mental health services; to facilitate significant community involvement in the planning utilization, and evaluation of mental health services; and to solicit comprehensive public and private financial support for mental health services.

 Appellee's Brief at 3.

obligation to provide mental health services to the indigent. Appellee is paid from state and federal government funds and receives a relatively small amount of support from charitable donations. Specifically, according to appellee's 1996–97 financial report, it received revenues as follows:

| Year | 1997 | 1996 Restated |
|---|---|---|
| **Revenues** | | |
| Support from the public | | |
| Grants | $3,874.384 | $3,697,511 |
| Medical assistance | $1,825,719 | $2,031,366 |
| Medicare | $ 121,045 | $ 90,210 |
| Supplemental security income | $ 474,723 | $ 383,972 |
| Total Support From The Public | $6,295,871 | $6,202,159 |
| **Other Revenues** | | |
| State property acquisition grant | | $1,575,000 |
| Private insurance | $ 25,733 | $ 29,965 |
| Fees | $ 50,762 | $ 19,666 |
| Other income | $ 55,169 | $ 12,585 |
| Total Other Revenues | $ 131,664 | $1,637,216 |
| Interest Income | $ 54,305 | $ 11,910 |
| Gain From Sale of Assets | $ 3,435 | |
| **Total Support and Revenues** | $6,485,275 | $7,851,285 |

Appellant's Brief at 3 (footnotes omitted). Private charitable donations were less than 1% of total revenues. Additionally, four volunteers each worked 600–800 hours per year.

■ At the hearing before the Tax Court, a witness for appellant, Robert E. Young, Associate Director, Taxpayer Services, Maryland State Department of Assessments and Taxation, discussed the test for determining whether an institution is charitable as set forth by the Court of Appeals in *Supervisor of Assessments v. Group Health Ass'n, Inc.*, 308 Md. 151, 517 A.2d 1076 (1986). In that case, the Court stated:

A determination of whether an institution is charitable must include a careful examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations.

*Group Health Ass'n*, 308 Md. at 157, 517 A.2d 1076.

Mr. Young, applying that test, testified that (1) appellee's stated purpose of "providing mental health services and a

substance abuse facility" was not a charitable purpose; (2) the actual work performed was not charitable because it was paid for out of government funds; (3) it did not benefit the general public because the government was paying a fee for service; and (4) appellee received no significant private donations. As mentioned previously, the Board affirmed.

## DISCUSSION

The charitable exemption statute in question provides, in pertinent part, as follows:

property is not subject to property tax if the property:

(i) is necessary for and actually used exclusively for a charitable or educational purpose to promote the general welfare of the people of the State, including an activity or an athletic program of an educational institution; and

(ii) is owned by:

1. a nonprofit hospital.

. . . .

2. a nonprofit charitable, fraternal, educational, or literary organization. . . .

3. a corporation or trustee that holds the property for the benefit of an exempt organization.

4. a nonprofit housing corporation.

Md.Code Ann., Tax–Prop. § 7–202(b)(1)(1987 Repl.Vol., 1999 Cum.Supp.).

In *Group Health Ass'n,* the Court of Appeals had occasion to interpret Art. 81, § 9(e)(1980), the predecessor to Tax–Prop. § 7–202 and specifically, the meaning of "charitable organization." In doing so, the Court identified the four factors quoted above.

Appellant contends that the Tax Court erred in failing to require that all four factors be met and, specifically, the fourth factor, and that this, in turn, lead the court to err in applying the first three factors. Appellant's position is that, as a matter of law, all four factors must be met in order for an

organization to qualify for a charitable exemption. With respect to the fourth factor, appellant asserts that it was not met because the evidence showed very modest private donations received by appellee, constituting a very small percentage of its budget. Additionally, relying primarily on *Supervisor of Assessments v. Har Sinai W. Corp.*, 95 Md.App. 631, 622 A.2d 786 (1993), appellant contends that the fourth factor cannot be met because the organization is paid with government funds. Appellant concedes that, if significant charitable contributions were made to appellee, all prongs of the test would be met.

Appellee contends that the Court of Appeals in *Group Health Ass'n* did not set forth a bright-line rule but merely identified factors to be considered, and that no one factor is determinative. Appellee explains that, based on the evidence before the Tax Court, the first three factors were met, and this is sufficient to sustain the decision of the Tax Court. Additionally, there was evidence that appellee did receive some income from private donations, although admittedly not substantial. Appellee concludes that, taking the evidence as a whole and applying the four factors, there was substantial evidence to support the Tax Court's determination.

Our review of the Tax Court's decision indicates that the court was aware of the applicable law. The Tax Court considered the first three factors and stated that they were clearly met because appellee provided services "to the masses," pointing out that appellee was required to treat all eligible persons. The Court concluded that appellee clearly benefitted the community and public welfare. We will not comment on those factors further because the *fourth factor* is the focus of this appeal.

With respect to the fourth factor, the Tax Court clearly considered it, but its conclusion is less clear. The Tax Court acknowledged that there was evidence of some private donations to appellee but also recognized the fact that appellee's funding came primarily from State government. The Tax

Court implicitly concluded that significant private donations were not necessarily required.

## I. Standard Of Review

 The Maryland Tax Court is an administrative agency. Md.Code. Ann., Tax–Gen. § 3–102 (1988, Cum.Supp.1999); *see Prince George's County v. Brown,* 334 Md. 650, 658 n. 1, 640 A.2d 1142 (1994); *Abington Ctr. Assocs. Ltd. Partnership v. Baltimore County,* 115 Md.App. 580, 589, 694 A.2d 165 (1997). On review, a decision of the Tax Court must be affirmed if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. *CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324 (1990); *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985); *Maisel v. Montgomery County,* 94 Md.App. 31, 34, 614 A.2d 1333 (1992). We may not substitute our judgment for that of the agency as to factual findings that are supported by substantial evidence. *Ramsay,* 302 Md. at 834, 490 A.2d 1296; *Rossville Vending Mach. Corp. v. Comptroller of the Treasury,* 97 Md.App. 305, 312, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993).

 In contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review. *Young v. Board of Physician Quality Assurance,* 111 Md.App. 721, 726, 684 A.2d 17 (1996), *cert. granted,* 344 Md. 568, 688 A.2d 447, and *cert. dismissed,* 346 Md. 314, 697 A.2d 82 (1997). Consequently, if the Tax Court's decision is based on a question of law, we are not bound by the agency's interpretation. *Department of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 72, 626 A.2d 360 (1993); *Ahalt v. Montgomery County,* 113 Md.App. 14, 22, 686 A.2d 683 (1996); *see, e.g., Roach v. Comptroller of the Treasury,* 327 Md. 438, 610 A.2d 754 (1992); *Friends School v. Supervisor of Assessments,* 314 Md. 194, 550 A.2d 657 (1988). The interpretation of a statute normally presents a question of law. *Papillo v. Pockets, Inc.,* 119 Md.App. 78, 83, 704 A.2d 448 (1997); *Hider v. Department of Labor, Licensing &*

*Regulation,* 115 Md.App. 258, 273, 693 A.2d 17 (1997), *rev'd on other grounds,* 349 Md. 71, 706 A.2d 1073 (1998); *Mayor & City Council of Ocean City v. Purnell–Jarvis, Ltd.,* 86 Md. App. 390, 413, 586 A.2d 816 (1991). When the Tax Court's legal interpretation of a statute is at issue, the substituted judgment standard applies to an erroneous conclusion of law. *Rossville,* 97 Md.App. at 311–12, 629 A.2d 1283; *see also People's Counsel v. Maryland Marine Mfg. Co.,* 316 Md. 491, 497, 560 A.2d 32 (1989).

▆▆▆▆ In interpreting a statute, the following principles of statutory construction are relevant. The guiding principle is to determine and effect the intent of the Legislature. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995); *Mayor & City Council of Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757 (1995); *Abington,* 115 Md.App. at 602, 694 A.2d 165. Ordinarily, we look to the language of the statute itself to accomplish this task. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996); *Allied Vending, Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988).

▆▆▆▆ When, as here, the Legislature has not defined a statutory term, we must consider the language of the statute itself and give that language its "ordinary and natural meaning [without] resort to subtle or forced interpretations...." *Maryland–Nat'l Capital Park & Planning Comm'n v. Department of Assessments & Taxation,* 110 Md.App. 677, 678 A.2d 602 (1996), *aff'd,* 348 Md. 2, 702 A.2d 690 (1997); *see also Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). If the statute is ambiguous, courts should consider not only the literal or usual meaning of the statutory language, but also its "meaning and effect in light of the setting, the objectives and purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986); *see also Kaczorowski,* 309 Md. at 513, 525 A.2d 628; *Rossville,* 97 Md.App. at 314, 629 A.2d 1283.

We will first examine the language in the exemption statute, and to aid us in our understanding of its meaning, we will look

at the development and usual meaning of the term, "charitable."

## II. History and Use of the Term, "Charitable"

"Charitable" is a generic term. Its meaning varies widely and the concept predates tax systems. *See* Bruce R. Hopkins, *The Law of Tax–Exempt Organizations*, § 5.1 (7 th ed.1998). The common law definition of "charitable" was developed in the context of encouraging and protecting charitable trusts. The definition of the term charitable derives from an English statute—the Preamble to the Statute of Charitable Uses of 1601. *See id.* (citing Stat. 43 Eliz., c. 4).

Charitable trusts (or, as they were called, "uses") were recognized and enforced by judicial decision prior to 1601, but because of the extreme poverty existing at that time, the Statute of Charitable Uses was enacted to (1) recognize and encourage contribution of private philanthropy and (2) address the prior inadequate supervision of charitable uses. *See* Gareth Jones, *History of the Law of Charity 1532–1827*, at 22 (1969).

The statute was based on prior holdings of the English Court of Chancery and the experiences of early cultures and religions. *See* Hopkins, *supra*, at 86–87. The drafters of the Statute of Charitable Uses used the following language to enumerate the purposes then recognized as charitable:

[S]ome for relief of aged, impotent and poor people, some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities, some for repair of bridges, ports, havens, causeways, churches, seabanks and highways, some for education and preferment of orphans, some for or towards relief, stock or maintenance for houses of correction, some for marriages of poor maids, some for supportation, aid and help of young tradesmen, handicraftsmen and persons decayed, and others for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants concerning payments of fifteens, setting out of soldiers and other taxes.

*Id.* (quoting St. 43 Eliz., C.4.). The enumerated charitable purposes were those commonly regarded as such in 1601, with the deliberate exception of religion, but the Statute was not intended as an exclusive list. *See* Jones, *supra,* at 120–21; *see also* Persons, Osborne & Feldman, *Criteria for Exemption under Section 501(c)(3),* IV Research Papers of the Commission on Private Philanthropy and Public Needs, at 1913 (Treasury 1977).

Court decisions thereafter interpreted the term liberally. Prior to 1700, there were several decisions that spelled out the privileges of charitable trusts, *e.g.,* relaxed requirements for existence, the development of the *cy près* doctrine, and the inapplicability of statutes of limitation to actions to enforce charitable uses. With time, however, charities fell into disfavor, inspired primarily by a fear of ecclesiastical charities. *See* Jones, *supra,* at 105–108.

An example of disfavor was the Mortmain Act of 1736 which voided devises of land to charities (as distinguished from *inter vivos* transfers) and vested the land in the testator's heirs. *See id.* After the Mortmain Act, charities sometimes sought to avoid the effect of the Act by calling themselves "public" bodies and not charities. The Act thus reoriented the significance of the term "charity," and it became a limiting term. *See id.* at 132–33; Mark A Hall & John D. Colombo, *The Statutes of Nonprofit Hospitals: Towards a Donative Theory of Tax Exemption,* 66 Wash. L.R. 307, 332–340 (1991). Courts continued to interpret the term liberally, however, presumably motivated by a desire to protect heirs. *See* Jones, *supra,* at 132–33.

As a result, the term "charitable," as it developed in English common law, was a definable legal concept, clearly less inclusive than lay terms such as "public benefit," "philanthropic," or "beneficial". *See* Hopkins, *supra,* at 87. Lord Macnaghten, in Pemsel's Case, authored the first comprehensive judicial definition of charity:

'Charity' in its legal sense comprises four principal divisions: Trusts for the relief of poverty; trusts for the advancement

of education; trusts for the advancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads.... The trusts last referred to are not the less charitable in the eye of the law, because incidentally they benefit the rich as well as the poor, as indeed, every charity that deserves the name must do either directly or indirectly.

*Commissioners for Special Purposes of Income v. Pemsel,* A.C. 531, 583 (1891). Those four divisions were in essence adopted in the Restatement of Trusts and are generally recognized as charitable in American law today. *See* Hall & Colombo, *supra,* at 334–36.

American colonists carried with them the English tradition of active private philanthropy. Public and private actions often were intertwined:

[The colonists] did not debate the question of public versus private responsibility ... public and private philanthropy were so completely intertwined as to become almost indistinguishable. The law itself reflected a pragmatic approach to the solving of social problems through philanthropy. Colonial assemblies went out of their way to remove obstacles in the way of charities. The courts valuing social betterment above legal technicalities, asserted a permissive charity doctrine that supported donors' benevolent intentions, even when the formulation of their plans was clearly imperfect.

H. Miller, *The Legal Foundations of American Philanthropy 1776–1844,* at xi (1961) (quoted in, James J. Fishman, *The Development of Nonprofit Corporation Law and an Agenda for Reform,* 34 Emory L.J. 617, 622 (1985)). Philanthropic approaches in Colonial America were not uniform. *See* Note, *The Enforcement of Charitable Trusts in America: A History of Evolving Social Attitudes,* 54 Va. L.Rev. 436, 440–41 (1968) (discussing Colonial statutes); Wyllie, *The Search for an American Law of Charity, 1776–1844,* 46 Miss. Valley Hist. Rev. 203, 204 (1959). From the beginning, the concepts of public and private charity coexisted. For example, in Boston

and other Massachusetts towns, public spending for poverty relief combined with private contributions and legacies. *See* Wyllie, *supra*, at 204–07. The typical vehicle for private philanthropic efforts was the English charitable use, which enjoyed universal approval. *See id.*

In the immediate post-Revolutionary period, the favorable attitude toward charity continued, but the law applicable to charities reflected the general uncertainty and transition characteristic of American law in the post-Revolutionary period. *See* Miller, *supra*, at 15. Most state constitutions were silent about charities. *See id.* Massachusetts, Pennsylvania, Vermont, and New Hampshire, however, gave constitutional protection to charities. *See id.* at 9–10. Other states passed statutes facilitating and reaffirming the benefits of charities to the community. *See id.* at 16–18. The retention of English statutes and practices resulted from the general continuation of English law and precedent. *See* E. Brown, *British Statutes in American Law 1776–1836,* at 24–26 (1964).

From the beginning, most states actively encouraged the incorporation of private associations that performed vital services. Several state legislatures passed statutes permitting incorporation of charitable organizations such as churches, schools, and literary societies. *See* J. Blandi, *Maryland Business Corporations 1783–1852,* at 11 (1934); *see also* 1802 Md. Laws 111; 1798 Md. Laws 24; 1779 Md. Laws 9. These early enactments evolved into our current statutory scheme, which includes the granting of privileges to charitable organizations, *e.g.,* tax exemptions.

### III. A Charitable Organization within the Context of Federal Income Tax

Federal law has provided for an exemption from income tax for charitable organizations virtually since the inception of the tax. *See* Boris I. Bittker & George K. Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Taxation,* 85 Yale L.J. 299, 301 (1976); Kenneth Liles & Cynthia Blum, *Development of the Federal Tax Treatment of Charities,* 39 Law & Contemp. Probs. 6 (Autumn 1975). Specifical-

ly, in 26 U.S.C. § 501(c)(3), the income of certain organizations is exempt, including corporations "organized and operated exclusively for ... charitable ... purposes." [2]

An organization will not be considered organized and operated exclusively for "charitable purposes" unless it serves a public purpose. *See* Income Tax Regs., § 1.501(c)(3)–1(d)(1); *see also Federation Pharmacy Services, Inc. v. Commissioner*, 625 F.2d 804, 807–09 (8 th Cir.1980). In order to operate "exclusively" for a charitable purpose, an organization must engage primarily in activities that accomplish such a purpose, and its exempt status will be lost if more than an insubstantial portion of its activities is not in furtherance of an exempt purpose. *See* Income Tax Regs., § 1.501(c)(3)–1(c)(1).

The term "charitable" in section 501(c)(3) is given a broad common law meaning. *See* Michael D. Rose & John C. Chommie, *Federal Income Taxation*, § 11.05 (3d ed.1998). The regulations indicate that the term "charitable" is not to be construed as limited by the separate enumeration of purposes in the statute. *See id.* (citing Treas. Reg. § 1.501(c)(3)–1(d)(2)). Other tax-exempt purposes may fall within the broad outlines of "charity" as developed by judicial decision. *See* 9 Jacob Mertens, Jr., *Law of Federal Income Tax*, § 34.21

---

**2.** The text of 26 U.S.C. § 501(c)(3) is as follows:

§ 501. Exemption from tax on corporations, certain trusts, etc.

. . .

(c) List of exempt organizations.—The following organizations are referred to in subsection (a) [as being tax-exempt]:

. . .

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

(1999) (citing Reg. § 1.501(c)(3)–1(d)(1)(i)(b) & (2)). The essential element of a charitable institution is that the interests served are exclusively public, rather than private. *See id.* (citing Reg. § 1.501(c)(3)–1(d)(1)(ii)).

## IV. A Charitable Organization within the Context of State Property Tax Exemption Statutes.

State property tax exemptions for charitable organizations and other organizations pursuing charitable purposes have existed since colonial times. *See* Douglas M. Mancino, *Income Tax Exemption of the Contemporary Nonprofit Hospital,* 32 St. Louis U. L.J. 1015, 1016 n. 1 (1988). Many states take into account the level of donative support an organization receives in determining whether it, or an activity, is charitable. *See, e.g., Rio Vista Non–Profit Hous. Corp. v. Ramsey County,* 277 N.W.2d 187 (Minn.1979). It may be sufficient if at least a portion of the capital cost of acquiring the facility used for the service was donated. *Compare, Methodist Old Peoples Home v. Korzen,* 39 Ill.2d 149, 233 N.E.2d 537 (1968), *with, People v. YMCA,* 365 Ill. 118, 6 N.E.2d 166 (1936). In some cases, even relatively minor contributions have sufficed. *See Yorgason v. County Bd. of Equalization,* 714 P.2d 653 (Utah 1986) (finding sufficient a loan guarantee, $1500 in unreimbursed expenses, 1,250 volunteer hours, a volunteer board, and an unspecified number of other volunteer hours).

Nevada, by legislation, conditions charitable status on a finding that the organization's funds "have been derived in whole or substantial part from grants or other donations from governmental entities or donations from the general public, or both, not including donations from any officer or trustee of the corporation." Nev.Rev.Stat. Ann. § 361.140.1(a) (Michie 1997). Other states require that operating expenses be met to some degree by contributions. *See, e.g., Utah County v. Intermountain Health Care, Inc.,* 709 P.2d 265 (Utah 1985). Pennsylvania requires that, to qualify as charitable, an activity must be "founded, endowed and maintained by public or private charity." 72 Pa. Cons.Stat. Ann. § 5020–204(a)(9) (Purdon 1999). Pennsylvania's courts have interpreted this to

mean that some portion of operating expense must be funded by charitable gifts. *See G.D.L. Plaza Corp. v. Council Rock School Dist.*, 515 Pa. 54, 526 A.2d 1173 (1987); *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985). *But see Four Freedoms House of Philadelphia v. City of Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971). The Pennsylvania statute additionally provides that

> any charitable organization providing residential housing services in which the charitable nonprofit organization receives subsidies for at least ninety-five per centum of the residential housing units from a low-income Federal housing program shall remain a "purely public charity" and tax exempt provided that any surplus from such assistance or subsidy is monitored by the appropriate governmental agency and used solely to advance common charitable purposes within the charitable organization.

72 Pa. Cons.Stat. Ann. § 5020–204(a)(3)(Purdon 1999). We are aware of no state legislation that specifically requires that services be entirely supported through gifts and contributions.

As in Maryland, other states take into account various factors in ruling on a property tax exemption for alleged charitable purposes or alleged charitable organizations.[3]

---

**3.** Courts in at least six states have expressly adopted multi-part tests for determining when an activity or organization is charitable. They are: Idaho, *Canyon County Assessor v. Sunny Ridge Manor, Inc.*, 106 Idaho 98, 675 P.2d 813, 815 (1984)(adopting an eight-part test); Illinois, *Methodist Old Peoples Home v. Korzen*, 39 Ill.2d 149, 233 N.E.2d 537, 540–41 (1968)(six-part test); Minnesota, *Rio Vista Non–Profit Hous. Corp. v. Ramsey County*, 277 N.W.2d 187, 190 (Minn.1979)(six-part test); Oregon, *Oregon Methodist Homes Inc. v. Horn*, 226 Or. 298, 360 P.2d 293, 298 (1961)(six-part test); Pennsylvania, *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (five-part test); and Utah, *Utah County v. Intermountain Health Care, Inc.*, 709 P.2d 265, 269 (Utah 1985)(six-part test). The Idaho court's test, for example, includes the following factors: 1) the stated purpose of the undertaking; 2) whether the activity is charitable in the sense that it is a gift for general public use; 3) whether the activity is supported by donation; 4) whether recipients are required to pay for the assistance they receive; 5) whether there is a general public benefit; 6) whether income received from the activity produces a profit; 7) to whom the

These factors include whether the organization receives support from donations and gifts. Some states that have adopted multi-part tests for determining whether an activity or organization is charitable are careful to note that it is not necessary to meet each and every part to qualify for tax exemption.

Additionally, where donations are a factor to be considered in determining whether an organization or purpose is charitable, the specific question of whether government subsidies should be treated as donations has been considered by courts in other states with varying results.[4] Some of the variations are due to differences in applicable statutes. Courts granting exemptions to governmentally subsidized projects have fre-

---

assets would go upon dissolution and 8) whether the 'charity' provided is based on need. 675 P.2d at 815.

4. *See, e.g., Yakima First Baptist Homes, Inc. v. Gray*, 82 Wash.2d 295, 510 P.2d 243, 246 (1973)(holding that where rent subsidies were paid pursuant to contract they could not be considered "public donations" under Washington's charitable tax exemption statute requiring that exempt organizations be "supported in whole or in part by public donations"); *G.D.L. Plaza v. Council Rock School Dist.*, 515 Pa. 54, 526 A.2d 1173, 1177 (1987) (holding that federal subsidies were not donations because the subsidies did not occur fortuitously, and property taxes were expressly covered by the federal subsidization, so neither the corporation nor the beneficiaries of the housing service would have been adversely affected by subjecting the facility to property taxes); *Clark v. Marian Park, Inc.*, 80 Ill.App.3d 1010, 36 Ill.Dec. 241, 400 N.E.2d 661, 664 (980)(finding that federal subsidies were not public charity); *Waterbury First Church Hous., Inc. v. Brown*, 170 Conn. 556, 367 A.2d 1386, 1389 (1976)(holding that federal subsidies did not constitute charitable means); *Parker v. Saint Stephen's Urban Dev. Corp.*, 243 N.J.Super. 317, 579 A.2d 360 (App.Div.1990)(determining that federally subsidized housing corporation did not depend on charitable contributions but rather served as quasi-public conduit for federal funds). *But cf. Franciscan Tertiary Province v. State Tax Comm'n*, 566 S.W.2d 213, 223 (Mo.1978)(finding that the purpose for which a property is used is determinative, and all other factors, such as whether the institution is supported by donations, are relevant only to the extent they indicate the institution's purpose, and federal subsidies have the same effect as charitable contributions from the private sector); *Rolla Apartments v. State Tax Comm'n*, 797 S.W.2d 781 (Mo.Ct.App.1990)(finding federal subsidization irrelevant to determination of charitable status, based on *Franciscan Tertiary* ); *Yorgason v. County Bd. of Equalization*, 714 P.2d 653, 657, 660 (Utah 1986)(finding

quently supported their finding by analogizing the subsidies to charitable contributions. *See, e.g., Maine AFL–CIO Housing Development Corp. v. Town of Madawaska,* 523 A.2d 581 (Me.1987); *Yorgason v. County Board of Equalization,* 714 P.2d 653 (Utah 1986); *cf., Huron Residential Services for Youth, Inc. v. Pittsfield Charter Township,* 152 Mich.App. 54, 393 N.W.2d 568 (1986)(finding that the receipt of per diem payments from the state covering cost of operations did not lead to loss of exempt status for a treatment center for troubled youth). Other courts, however, have found governmental subsidies to be evidence that the facility did not relieve a governmental burden and, thus, was not entitled to tax-exempt status. *See, e.g., Waterbury First Church Housing, Inc. v. Brown,* 170 Conn. 556, 367 A.2d 1386 (1976)(denying tax exemption of housing for low and moderate income elderly); *Dow City Senior Citizens Housing, Inc. v. Board of Review of Crawford County,* 230 N.W.2d 497 (Iowa 1975) (same); *compare G.D.L. Plaza Corp. v. Council Rock School Dist.,* 515 Pa. 54, 526 A.2d 1173 (1987)(denying tax exemption to a federally-subsidized housing project for the elderly and handicapped) *with Four Freedoms House v. City of Philadelphia,* 443 Pa. 215, 279 A.2d 155 (1971)(holding a similar housing project exempt).

## V. A Charitable Organization within the Context of the Maryland Property Tax Exemption

In Maryland, the statutory exemptions from real property tax are contained in Md.Code Ann., Tax–Property §§ 7–201—7–218 (1994 Repl.Vol. & Supp.1999). No organization is automatically exempt from real property tax but must apply and demonstrate that the actual use of the property is within the ambit of the particular exemption statute. *See* 2 Robert A. Rombro, Esq., et al., *Maryland Taxes,* § 18.40 (2nd ed.1996). The fact that a property is being used for nonprofit purposes will not merit an exemption unless it is specifically

---

that the use of the property is determinative, and it is irrelevant that the government, rather than a private benefactor, makes up the deficit).

exempted by law. *See Supervisor of Assessments v. Trustees of Bosley Methodist Church Graveyard,* 293 Md. 208, 212, 443 A.2d 91 (1982) (holding that churches, religious institutions, fraternal, benevolent, or other charitable groups enjoy no inherent right to exemption from real property taxation within the state unless expressly exempt).

The Legislature has determined that there must be (1) a charitable or educational purpose and (2) the property must be owned by (i) a nonprofit hospital, (ii) a nonprofit charitable, fraternal, educational, or literary organization, (iii) a corporation or trustee that holds the property for the benefit of an exempt organization, or (iv) a nonprofit housing corporation. Md.Code Ann., Tax–Prop. § 7–202 (1994 Repl.Vol. & Supp. 1999). "Fraternal organization" is defined in the statute, and examples are given under subsection 2—for example, a public library under Title 23 of the Education Article and a men's or women's club that is a nonpolitical and non-stock club.

The Legislature has not defined the term "charitable," as used in section 7–202 of the Tax–Property Article, either as a "charitable purpose" or as a "charitable organization." The Court of Appeals in *Supervisor of Assessments v. Group Health Ass'n,* 308 Md. at 157, 517 A.2d 1076, however, established the four factors that must be considered in determining whether an organization[5] is charitable: (1) the stated purpose of the organization, (2) the work performed, (3) the benefits to the community and to the public welfare in general, and (4) the source of funds. This four step analysis was considered in *Comptroller v. Maryland State Bar,* 314 Md. 655, 669, 552 A.2d 1268 (1989); *Supervisor of Assessments v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988); *Rivera v. Prince George's County Health Dept.,* 102 Md.App. 456, 464, 649 A.2d 1212 (1994); *Supervisor of Assessments v. Har Sinai W. Corp.,* 95 Md.App. 631, 638–39, 622 A.2d 786

---

**5.** The Court did not address whether the same factors should be considered in interpreting the "charitable purpose" portion of the statute as applied to an entity other than a charitable organization, *e.g.,* a nonprofit housing corporation.

(1993); and *Vulcan Blazers of Baltimore City, Inc. v. Comptroller*, 80 Md.App. 377, 385, 564 A.2d 77 (1989).

In *Maryland State Bar Ass'n*, the Court of Appeals determined that a finding by the Tax Court that the Maryland State Bar Association (MSBA) was not a charitable organization for purposes of the state sales tax exemption was supported by substantial evidence. The record indicated that the Tax Court, in making its determination, considered the factors set forth in *Group Health Ass'n*. Specifically, the Tax Court reviewed the MSBA's articles of incorporation setting forth the purposes of the organization, evidence regarding the work performed by the MSBA and the extent to which that work benefitted the community and public welfare, and donations received by the organization. 314 Md. at 670, 552 A.2d 1268. Unlike the facts before us in this case, in *Maryland State Bar Ass'n*, the majority of the services were provided to and for MSBA members, and income was derived almost exclusively from membership dues and fees. *See id.*

In *Asbury Methodist Home, Inc.*, a charitable corporation challenged the decision of the Tax Court denying a real property tax exemption for apartments for the elderly, which were owned and operated by a nonprofit, charitable corporation. The Tax Court had held that the apartments, providing moderate income housing to the elderly, did not fulfill a charitable purpose and, thus, were not entitled to property tax exemption. The Court of Appeals held that the Tax Court finding was supported by substantial evidence. In particular, there was evidence of significant financial requirements imposed upon applicants and significant medical and financial screening in order to gain admission. 313 Md. at 635–36, 547 A.2d 190.

In *Rivera*, this Court considered whether the State Health Department, a governmental agency, was a charitable organization for purposes of charitable immunity. In doing so, we considered the four factors set forth in *Group Health Ass'n*. In *Rivera*, the State Health Department was not considered a charitable organization because it "is not a separate entity

operated by the County as a proprietary function, nor is it supported by donations." 102 Md.App. at 464–65, 649 A.2d 1212. *Rivera* is distinguishable from this case for several reasons. In particular, the Court was not reviewing an agency determination of charitable status, the doctrine of charitable immunity is inapposite to this case, and while the State Health Department is supported entirely by public tax-generated funds, it is a governmental agency, not a private entity as in the facts *sub judice.*

In *Vulcan Blazers,* this Court reversed a Tax Court determination that an organization was exempt from admissions and amusement tax. We determined that the organization—an association of black firefighters—was not a charitable organization exempt from the tax. We found that the Tax Court did not apply the correct principles of law governing the case, but instead it had erroneously reasoned that "because firefighters are indispensable public servants and because they work under unusually dangerous and stressful conditions, any expenditures by a firefighters organization that improve 'morale' are 'charitable' within the meaning of Md. Ann.Code art. 81, § 406(1), even though under ordinary circumstances they simply would be fraternal." 80 Md.App. at 384, 564 A.2d 77. The Tax Court had failed to consider the factors set forth in *Group Health Ass'n.* In addition, the case addressed statutory language different from that before us in this case. There, the statute, section 406(1) of article 81—the predecessor statute of Md.Code Ann., Tax–Gen. § 4–103(b)(4)(ii) and (iii)—exempted from the tax some, but not all, fire department and fraternal-type organizations.

In *Har Sinai W. Corp.,* Har Sinai constructed a high-rise apartment building for the elderly and handicapped with proceeds from a HUD loan. In addition, Har Sinai received HUD rental subsidies. All revenues of the project were from federal subsidies and rental payments made by tenants. This Court held that the low income high-rise building, owned and operated by a non-profit corporation, providing non-profit housing to its tenants, was not entitled to a tax exemption because the apartment building was funded entirely by federal

subsidies and rent paid by tenants. 95 Md.App. 631, 622 A.2d 786. As part of the analysis, we stated that federal rent subsidies were not "donations" under the four-factor test set forth in *Group Health Ass'n.* In *Har Sinai W. Corp.*, the question was not whether the entity involved, a nonprofit housing corporation under section 7–202(b)(4), was a charitable organization but, rather, whether a charitable purpose was being served.

Significantly, neither *Group Health Ass'n* nor the cases discussing it turned on the question of whether private donations are required. In *Group Health Ass'n, Maryland State Bar Ass'n, Asbury Methodist Home,* and *Har Sinai W. Corp.,* the organizations did not meet the charitable purpose requirement. *Rivera* and *Vulcan Blazers* are distinguishable on other grounds.

## VI. Analysis

 Modern tax codes incorporate the concept of "charitable" organization. When the concept was developed as part of the law of charitable trusts, there were no tax codes as we know them today. At common law, the primary factor in determining whether an organization was charitable was its purpose.

The term "charitable" is sometimes used in a lay sense as an all inclusive term—meaning beneficial. It is sometimes used in a less inclusive but, nevertheless, loose undefined sense that goes beyond the common law meaning. For example, 26 U.S.C. § 501(c)(3) lists eight categories of exempt organizations of which charitable is one. *See supra,* n. 1. The entire list, without employing the term as a work of art, is sometimes referred to as "charitable."

Despite the long history of charitable exemptions in tax codes, there is very little legislative history, and none helpful to our resolution of the question before us. The federal income tax code does not expressly limit the concept of charitable, *e.g.,* by requiring private donations, although some court decisions have imposed such limitations. Most state

income tax codes, including Maryland's, *see* Md.Code, Tax–Gen. § 10–218, automatically accept the federal exemption. Most states, including Maryland, have separate tax codes for property tax, income tax, and other forms of tax. What may facially appear to be the same concept in different tax codes is not necessarily treated the same.[6]

All decisions as to what should be taxed are policy questions for the appropriate legislative body. Because it involves a determination of whether the benefit to the public welfare justifies an implicit governmental subsidy, the question of whether an organization should be exempt from property tax also is a legislative policy question.

Some states have, by statute, expressly defined and limited charitable organizations. Maryland has not done so beyond requiring that it be "a nonprofit charitable ... organization" and that its property be "necessary for and actually used exclusively for a charitable ... purpose to provide for the general welfare of the people of the State...."

 Significantly, the Maryland statute is silent with respect to the means by which an organization is funded. The Legislature may decide to further define and perhaps limit the exemption, but it has not yet done so. We, therefore, conclude that "charitable" is used in the general common law sense and significant private donations are not required as a matter of law.

Having thus interpreted the statute, we read *Group Health Ass'n* as not necessarily requiring significant private donations but as having identified factors to be considered in making

---

**6.** Sometimes a tax code references another tax code. If it does, it is frequently not helpful in resolving a particular issue. With respect to the issue before us, *see, e.g.,* the amendment to Section 7–202 in 1998, which provides that property transferred to a nonprofit charitable organization is abated from the date when the instrument transferring title is recorded if, in pertinent part,

> (i) the property is transferred to a nonprofit charitable organization qualified under § 501(c)(3) of the Internal Revenue Code; [and]
> (ii) the property becomes exempt under this section.

Md.Code Ann., Tax–Prop. § 7–202(d)(1)(i)(ii)(1999 Cum.Supp.).

what is always a factual determination. This includes the ultimate question of whether an entity is a "charitable organization" even if the underlying facts are not in dispute.

Consequently, the question of whether appellee is a charitable organization is a question of fact. The tax court considered the various factors articulated in *Group Health Ass'n* and made a factual determination. On the facts before us, specifically, (1) a clear and virtually conceded charitable purpose, (2) the work performed was charitable, (3) the existence of a benefit to the general public, (4) support for appellee from public funds through grants and programs to aid persons in need, and (5) some, albeit minimal, private assistance to appellee, we cannot say the tax court lacked evidence to sustain its decision.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**